**BECA OF ALEXANDRIA, L.L.P., et al., Relators,**

v.

**COUNTY OF DOUGLAS, Minnesota, by its BOARD OF COMMISSIONERS, Respondent.**

No. C2–99–1518.

Court of Appeals of Minnesota.

March 21, 2000.

---

Joseph M. Finley, Shannon D. Hoagland, Leonard, Street and Deinard, P.A., Minneapolis, MN (for relators).

Mark R. Azman, Michael J. Ford, Quinlivan & Hughes P.A., St. Cloud, MN; and Christopher Karpan, Douglas County Attorney, Alexandria, MN (for respondent).

Considered and decided by CRIPPEN, Presiding Judge, KLAPHAKE, Judge, and SHUMAKER, Judge.

## OPINION

KLAPHAKE, Judge.

Relators BECA of Alexandria, LLP, and Carlson Real Estate Co. challenge by writ of certiorari the decision of respondent Douglas County Board of Commissioners (the board) to prohibit all docks, rafts, buoys, or mooring facilities as a condition for granting relators conditional use permits (CUPs) for two parcels of land located in Douglas County. Because relators established their entitlement to a CUP for the parcel known as Stone Gate North and no evidence to the contrary was presented, we reverse as to that permit. Because some evidence was presented to challenge issuance of a CUP for the parcel known as Stone Gate, but that evidence was legally insufficient to support the board's decision, we remand that part of the board's decision to determine the number of mooring slips that would be compatible with public health, safety, and welfare.

## FACTS

Relator BECA, a limited partnership, is purchasing two parcels of land from Carlson Real Estate Co., also a partnership, to develop two residential planned unit developments (PUDs). Although the parcels are not contiguous, both are on Lake Darling in Alexandria and are on the same shallow, weedy bay.

BECA plans to build 30 detached residential units in the larger PUD, called Stone Gate, which encompasses about 22 acres. The proposal for this parcel meets all density, set-back from the ordinary high-water mark, and open space zoning requirements; no zoning variances are sought. The parcel has about 1,200 feet of shoreline.

BECA also plans to develop a second PUD, with 19 attached units on a 12.6-acre

parcel with 1,000 feet of shoreline. This parcel, called Stone Gate North, also meets all density, set-back from the ordinary high-water mark, and open-space zoning requirements, and no zoning variances are sought.

BECA brought both projects before the planning commission for preliminary plat approval and CUPs, which are required for PUDs. If the parcels were divided into traditional lot block developments, no CUPs would be required. Unlike a lot block development, however, a PUD must meet more stringent set-back requirements, be attached to city water and sewer, provide storm water drainage and grading, and limit the use of fertilizers. In addition, PUDs located on shorelands are required to centralize dock facilities to minimize impact on shoreland environment.

Each PUD plan includes one centralized mooring dock for each PUD, with a slip for each residence, or 30 slips at Stone Gate and 19 at Stone Gate North. Covenants written into the homeowners' association agreements will include a no-wake policy, restrict access through a marked channel, and prohibit trimming or destruction of vegetation and application of fertilizers within 75 feet of the ordinary high-water mark. In both PUDs, each unit owner will be allowed to moor only one watercraft.

The Minnesota Department of Natural Resources (DNR) has approved permits to remove vegetation to allow access to the centralized mooring facilities. Although the bay was once protected as a fish-spawning site, it has not been so designated since 1981. The local township approved both projects, and various county engineers and staff were in the process of approving the projects.

In preliminary hearings, the county planning commission heard comments from neighboring residents about the impact on fishing, density, increased boating, shallowness of the bay, and the negative consequences of traffic on the vegetation and water clarity. The residents' comments, however, were not scientific, but were merely anecdotal in nature. The planning commission ultimately recommended not issuing permits based on (1) common sense, (2) a 20 percent increase in boat traffic, (3) degradation of water quality, and (4) insufficient water levels.

The two applications were sent to the board, which held hearings on July 27 and August 10. Neighboring residents once again opposed the two projects, but offered no expert testimony. The board tended to treat the two parcels as one application, and in so doing, took no direct testimony regarding the Stone Gate North parcel.

At the August 10 meeting, the board approved the preliminary plats and CUPs for both projects, but to each CUP added a condition that no docks, rafts, buoys, or watercraft mooring areas would be allowed on the lake, because of "concerns for the aquatic ecosystem (i.e. fishing and wildlife) and the shallow depth of the water."

BECA and Carlson appeal.

## ISSUE

Did the county board act in an arbitrary or capricious manner, or without evidentiary support, in conditioning the conditional use permits on an absolute prohibition of docks, rafts, buoys, and mooring facilities?

## ANALYSIS

■ When reviewing a county board's decision on a writ of certiorari,

> the court's inquiry is limited to questioning whether the board had jurisdiction, whether the proceedings were fair and regular, and whether the board's decision was unreasonable, oppressive, arbitrary, fraudulent, without evidentiary support, or based on an incorrect theory of law.

*Radke v. St. Louis County Bd.,* 558 N.W.2d 282, 284 (Minn.App.1997) (citation omitted).

A court gives great deference to a county's land use decision and will overturn such decisions only when there is no rational basis for them. *See SuperAmerica Group, Inc. v. City of Little Canada*, 539 N.W.2d 264, 266 (Minn.App.1995), *review denied* (Minn. Jan. 5, 1996). A county has broad discretion in deciding whether to grant or deny a conditional use permit. *Haen v. Renville County Bd. of Comm'rs.*, 495 N.W.2d 466, 471 (Minn. App.1993), *review dismissed* (Minn. Mar. 30, 1993). However, where a zoning ordinance authorizes a use by special permit, the denial of such a permit must be based on reasons of public health, safety, and general welfare or because of express language in the county's land use plan. *Hubbard Broadcasting, Inc. v. City of Afton*, 323 N.W.2d 757, 763 (Minn.1982) (where land use plan emphasizes rural character and scenic beauty, council's denial of permit for satellite station because of incompatibility with comprehensive plan was legally sufficient); *C.R. Invs., Inc. v. Village of Shoreview*, 304 N.W.2d 320, 324 (Minn.1981).

When reviewing the denial of a permit, the court must determine if there is a rational basis for the municipality's decision; this court may not substitute its judgment, if there is a legally sufficient reason for the decision, even if it would have reached a different conclusion. *St. Croix Dev., Inc. v. City of Apple Valley*, 446 N.W.2d 392, 398 (Minn.App.1989), *review denied* (Minn. Dec. 1, 1989). A legally sufficient reason is one "reasonably related to the promotion of the public health, safety, morals and general welfare of the community." *Id.* A municipality may not base its denial on "unreasonably vague or unreasonably subjective" standards. *Trisko v. City of Waite Park*, 566 N.W.2d 349, 353 (Minn.App.1997) (quotation omitted), *review denied* (Minn. Sept. 25, 1997). "If an entity's zoning ordinances specify standards to which a proposed plat must conform, it is arbitrary as a matter of law to deny approval of a plat which complies in all respects with the ordinances." *Hurrle v. County of Sherburne*, 594 N.W.2d 246, 250 (Minn.App.1999) (quotation omitted).

In making its decision, a municipality may not "reject expert testimony without adequate supporting reasons." *SuperAmerica*, 539 N.W.2d at 267. Non-experts can supply adequate reasons to counter or reject expert opinions, but those reasons must be concrete and based on observations, not merely on fears or speculation. *See id.* at 267–68; *Trisko*, 566 N.W.2d at 356.

In this case, county ordinances mention the pressures that shoreland development here on areas where "it is people's desire to reside in an atmosphere where the lakes can be enjoyed." Douglas County, Minn., Zoning Ordinance, Introduction. The general policies of the ordinances include that shoreland areas should be developed in an "orderly" fashion to preserve the quality and environment of surface waters, and to protect certain areas from development. *Id.*, General Land Use Policies 5, 6, 13. The ordinances encourage PUDs, "to enable imaginative and creative land uses which emphasize[ ] flexibility and open space." *Id.* § IV.A. The ordinances favor environmental design possibilities that preserve "health, safety and general welfare" of the community. *Id.* § IV.A.3. When PUDs are built in residential shoreline districts, the ordinances state that shore recreation facilities, which include docks and mooring areas, should be "centralized and located in areas suitable for them." *Id.* § IV.D.2.b.(4.)(c.).

The board did not deny the CUPs, but placed significant restrictions prohibiting "docks, rafts, buoys, or water craft mooring areas." The board's stated reason for this restriction was "due to concerns for the aquatic ecosystem (i.e. fish and wildlife) and the shallow depth of the water in the proposed area." While not an outright denial, this amounts to a severe limitation of a right generally reserved to riparian owners. *See McLafferty v. St.*

*Aubin,* 500 N.W.2d 165, 168 (Minn.App. 1993) ("Riparian rights are generally described as the rights *to use and enjoy* the profits and advantages of the water.").

 The board's decision was based solely on comments of lake residents and a letter from a DNR Fisheries Supervisor, who simply stated that any development would have an impact on aquatic life. In support of its application, BECA provided permits from the DNR, statements from a surveyor, permit approvals, township approval, and an informal environmental assessment worksheet prepared by a firm hired by BECA. The board's reasons for prohibiting any docks, buoys, or rafts are vague, based solely on unscientific concerns rather than factual data, and are insufficient to support the board's decisions. *See C.R. Invs.,* 304 N.W.2d at 325.

BECA has complied with the requirements of the ordinances, and these ordinances contemplate the establishment of central docking facilities as planned by BECA. The declared bases for the condition are vague and overbroad; any type of development will have an impact on the aquatic environment, whereas the depth of the bay, which is not in the record, is not directly related to public safety, health, and welfare.

## DECISION

Because there is no basis in the record to support the county's decision regarding Stone Gate North, we reverse the board's imposition of the condition of no docks, rafts, buoys, or mooring facilities and direct the issuance of the CUP and plat approval. We are not required to remand where a zoning authority's decision is arbitrary because it is unsupported by legally sufficient reasons. *Northern States Power Co. v. Blue Earth County,* 473 N.W.2d 920, 923 (Minn.App.1991).

Although evidence was presented to challenge issuance of a CUP for Stone Gate, that evidence was insufficient to support the board's total prohibition of any docks, rafts, buoys, or mooring facilities. We direct the board to consider how many slips are compatible with public health, safety and welfare, bearing in mind that some number of slips must be made available for the use by Stone Gate residents. At the board's discretion, it may rely on the record before it or re-open the record for the limited purpose of determining the number of slips appropriate for the centralized docking facility at Stone Gate.

**Reversed and remanded.**