**BILLY GRAHAM EVANGELISTIC ASSOCIATION, Respondent,**

v.

**CITY OF MINNEAPOLIS, Petitioner, Appellant.**

No. C1–01–2127.

Supreme Court of Minnesota.

Aug. 14, 2003.

Jay M. Heffern, City Attorney, Carol E. Lansing, Assistant City Attorney, Minneapolis, MN, for Appellant.

Richard D. Snyder, Fredrikson & Byron, PA, Minneapolis, MN, for Respondent.

OPINION

MEYER, Justice.

In this case we decide whether the City of Minneapolis (the City) acted unreasonably, arbitrarily, or capriciously in designating an area near downtown Minneapolis as an historic preservation district. Respondent, Billy Graham Evangelistic Association (BGEA), owns four buildings in the designated district. By writ of certiorari, BGEA challenged the City's designation and the court of appeals granted relief to BGEA. The City appeals.

Minnesota Statutes § 471.193 announces a state policy that the "historical, architectural, archaeological, engineering, and cultural heritage of this state is among its most important assets." Minn.Stat. § 471.193, subd. 1 (2002). In order to promote the conservation of historic properties, the legislature granted local governments the power to establish commissions to designate districts or buildings of historic significance and to preserve those assets. *Id.,* subds. 2, 3.

The City exercised the authority granted by the legislature and formed the Heritage Preservation Commission of the City of Minneapolis (HPC) under chapter 599 of the City code. Minneapolis, Minn., Code of Ordinances (Code) ch. 599 (2001). The commission is made up of ten members, chosen for their knowledge and expertise in the field of historic preservation.

*See* Code § 599.120(c) (2001). The commission considers seven criteria in determining whether a property is worthy of designation as a landmark or historic district.[1] *See* Code § 599.210 (2001). Those criteria include the property's association with significant events or periods, significant people, the City's identity, a particular architectural or engineering style, or a unique landscape design. *Id.*

In November of 1999, a neighborhood group, the Citizens for a Loring Park Community, asked the HPC to study whether an area on and around Harmon Place, from Loring Park to 11th Street South, merited a designation as historic. The citizens' group liked the mini-downtown feel of the area, with its eclectic group of businesses in one- to four-story buildings and pedestrian-friendly streets. In 2000, the HPC asked the City planning department to commission a study of the area for possible historic designation. The planning department contracted with Carole Zellie of Landscape Research to conduct the designation study. Zellie presented her report to the planning department in April of 2001. She concluded that an area comprising ten city blocks (see map appended to this opinion) merited historic designation for its role in the City's historic automotive industry and met criteria 1 and 4 of the Code.[2] The Zellie report concluded that the area could

be designated for protection because of its past association as the hub of the automotive sales district in Minneapolis at the beginning of the 20th century.

The Zellie report explained that "the automobile dealership evolved into a prominent and very specialized building type" and that the Harmon Place area showed "some of the best efforts of local architects." Various architectural styles for these buildings were "all arranged around the important display windows." Zellie concluded that:

> Harmon Place was synonymous with the Minneapolis automotive industry for fifty years, from the birth of the local and national industry to its dispersal to the suburbs. Twenty-two automotive buildings from the dozens which once lined Hennepin Avenue and Harmon Place survive in the ten-block [area]. Most of the contributing buildings still embody a good sense of an important era in the city's growth, and illustrate a chapter of its transportation, economic, and social history.

Having determined that the area met two of the criteria for designation, Zellie analyzed each of the individual buildings in the area. Of the 42 buildings comprising the proposed District, Zellie found 26 were "contributing," i.e., met criteria 1 and/or 4 of the ordinance, and 22 of those 26 fit the additional unifying characteristics Zellie

---

1. The criteria considered when designating a property as an historic district are:
   (1) The property is associated with significant events or with periods that exemplify broad patterns of cultural, political, economic or social history.
   (2) The property is associated with the lives of significant persons or groups.
   (3) The property contains or is associated with distinctive elements of city identity.
   (4) The property embodies the distinctive characteristics of an architectural or engineering type or style, or method of construction.

   (5) The property exemplifies a landscape design or development pattern distinguished by innovation, rarity, uniqueness or quality of design or detail.
   (6) The property exemplifies works of master builders, engineers, designers, artists, craftsmen or architects.
   (7) The property has yielded, or may be likely to yield, information important in prehistory or history.

   Code § 599.210 (2001).

2. *See supra* note 1.

identified: buildings constructed between 1907–1930 with some relation to the automobile industry. The remaining 16 properties were designated as "noncontributing."

After Zellie's study recommended historic designation for the Harmon Place Historic District (the District), the proposed designation began working its way through the approval process required by city ordinance. *See* Code §§ 599.200–.300 (2001).[3] First, the HPC forwarded the Zellie report to the state historic preservation officer, who concurred that the District was eligible for preservation under criteria 1 and 4. Then the City Planning Department sent a letter to property owners in the District, informing them that a consultant had recommended historic designation, that they could access the report, and there would be a public hearing likely held in August of 2001. The City Planning Commission adopted the findings of the planning department and approved the designation on August 6, 2001. The proposed designation included five buildings owned by BGEA at that time: buildings 11, 12, 13, 25, and 27 (see map).

Meanwhile, in July 2001, the HPC denied a request from the University of St. Thomas to demolish five buildings that St. Thomas owned within the proposed District.[4] St. Thomas appealed to the city council, which, on August 10, 2001, granted permission for the demolition of the re-

quested buildings, including four buildings designated as contributing properties.

Before the first public hearing on the District's historic designation, BGEA hired Charlene Roise, of Hess, Roise and Company, to conduct an independent study of the proposed District. Roise concluded that the Fawkes block, at the westernmost end of the proposed District, bordered by Hennepin Avenue, Harmon Place, and Maple Street, fit the criteria for designation as an historic district. She disagreed with the designation of the remainder of the nine blocks, however. She recommended the City designate the Fawkes block as a district, and then individually designate buildings numbered 4, 5, 10, and 14 as historic (none of which were owned by BGEA). Alternatively, Roise suggested the City divide the large proposed District into two subdistricts: the Fawkes block being the first; the second capturing a group of buildings in the area bounded by the alley that runs between Hennepin Avenue and Harmon Place, Yale Place, 11th Street, and Spruce Place. Her proposed alternative boundaries would still have captured two of BGEA's buildings (those numbered 11 and 12) in the historic district.

Apparently in response to Roise's report, the planning department revised the proposed District to exclude (1) the large "superblock" containing the Minneapolis Community College, the Minneapolis Area Vocational Technical Institute, and the H.

---

3. Sections 599.200–.300 of the City Code outline the process for designation. Code §§ 599.200–.300 (2001). First, the property must be nominated by one of a select group of people; then the HPC may direct the planning director to study the property. Code §§ 599.220–.230. The planning director shall submit all proposed sites to the state historic preservation officer for review and comment. Code § 599.250. Next the City Planning Commission shall review the designation and there must be public hearings with proper

notice. Code §§ 599.260–.270. After the public hearings, the commission makes findings and submits them to the zoning and planning committee of the city council, which reviews the recommendation and then submits the question to the city council, which has the final decision. Code §§ 599.280–.290.

4. St. Thomas owned buildings 1, 2, 3, 39, 40, 41, and 42, but the HPC only denied the demolition of buildings 2, 39, 40, 41, and 42.

Alden Smith house [5] (buildings 15, 16, and 17), because the buildings did not contribute to the proposed District; (2) the frontage along Hennepin Avenue, because the character of the buildings did not reflect the character of the District and the only contributing properties had been extensively remodeled; and (3) all of the property owned by the University of St. Thomas. The effect of the planning department's revision was to split the District into two portions: the Fawkes block and a northeast portion.

The HPC held a public hearing on September 25, 2001, and in response to the significant interest in the designation, the HPC scheduled a second public hearing on October 16, 2001. At both meetings, there was significant opposition to the area's historic designation by local property owners. The owners complained that they had not had enough input in the process, that the designation would decrease their buildings' value, that the auto industry was not significant enough in the history of Minneapolis, and that the buildings had already been altered too much to merit designation. Additionally, Roise and Marjorie Pearson (also a consultant for BGEA) spoke on behalf of BGEA and urged limiting the historic designation to the Fawkes block and four individual buildings in the northeast portion.

Residents of the neighborhood spoke in favor of the designation at the public hearings, mentioning that they wanted to save the character of the area, its historic value, and the pedestrian-friendly nature of the District. City Council Member Lisa Goodman opined: "[T]his is about preserving one of the last, very unique architectural areas in the city." At the October 16 HPC meeting a motion to approve the two subdistricts was amended to include five prop-

erties facing Hennepin Avenue (buildings numbered 21–25). The commissioners discussed why the HPC staff had recommended excluding them, and reasons for keeping them in the District. Finally, the HPC approved the designation of the two subdistricts, with the inclusion of the five buildings facing Hennepin Avenue. The HPC did not make written findings to support its inclusion of the Hennepin Avenue properties.

On October 31, the City's Zoning and Planning Committee (Zoning) heard public testimony and then adopted the findings of the planning department, requested findings to support the inclusion of the Hennepin Avenue properties, and approved the designation. Zoning then passed the recommendation on to the city council for final approval, together with findings that the inclusion of the Hennepin Avenue properties helped to preserve the integrity of the contributing properties and the character of the District. On November 9, 2001, the city council passed two resolutions, designating the southwest portion (Fawkes block) and the northeast portion (which included respondent BGEA's four properties) as the Harmon Place Historic District.

On a writ of certiorari to the court of appeals, BGEA challenged the designation of the northeast portion of the District, claiming that the City acted arbitrarily, capriciously, or unreasonably. The court of appeals agreed with some of BGEA's claims as to how the City's action was arbitrary, and did not address the remainder. The court focused on three aspects of the designation that it characterized as arbitrary: the inclusion of the properties facing Hennepin Avenue, the fact that only that portion of building 13 facing Harmon

5. The Alden Smith house did not contribute to this District because it was built before 1907, but it was already designated individually as a landmark property.

Place is included within the District, and the inconsistent use of an alley as a boundary. *Billy Graham Evangelistic Ass'n v. City of Minneapolis,* 653 N.W.2d 638, 644–46 (Minn.App.2002). The court reversed the City's designation of the northeast portion of the District, finding it to be arbitrary and capricious. *Id.* at 646.

■ The City claims the court of appeals misstated the record and substantially departed from the usual course of justice in its standard of review of quasi-judicial decisions. BGEA reasserts the two broad claims it made to the court of appeals. First, BGEA argues that the City erred as a matter of law in interpreting the heritage preservation ordinance to permit inclusion of noncontributing properties in an historic district. Second, BGEA contends that the City's designation of the District was arbitrary or capricious in various substantive and procedural ways. We review the City's designation of historic property independently from the court of appeals. *See Swanson v. City of Bloomington,* 421 N.W.2d 307, 311 (1988); *Northwestern College v. City of Arden Hills,* 281 N.W.2d 865, 868 (Minn.1979). In our independent review of the City's action, we will focus on BGEA's arguments as to how the City's action was unreasonable, arbitrary, or capricious.

## I.

■ We begin with BGEA's argument that the City erred as a matter of law in interpreting the heritage preservation ordinance to permit inclusion of noncontributing properties in a district. We interpret an existing city ordinance de novo.

*Frank's Nursery Sales, Inc. v. City of Roseville,* 295 N.W.2d 604, 608 (Minn. 1980).

■ The Code defines an historic district as *"[a]ll* property within a defined area designated as an historic district by the city council because of the historical, cultural, architectural, archaeological or engineering significance of the district, or designated as an historic district by state law." Code § 599.110 (2001) (emphasis added). The ordinance says the seven different "criteria shall be considered in determining whether *a property* is worthy of designation" and defines property as *"[a]ny* land, building, structure or object, surface or subsurface area, natural or landscape feature." Code §§ 599.210, 599.110 (2001) (emphasis added). BGEA interprets the word property to mean a singular structure, i.e., one building or parcel; and argues that each singular property must possess the required historical, cultural, or architectural significance. We do not read the ordinance so narrowly. The ordinance permits *any* building, structure, surface area, or landscape feature to be included in an historic district. The ordinance does not limit properties to those with historical significance. We conclude that the plain language of the ordinance allows for the inclusion of noncontributing properties within an historic district and the City did not err as a matter of law in permitting inclusion of some noncontributing properties in the District.[6]

## II.

■ We turn to the central question in this case, whether the City acted arbitrari-

---

6. BGEA argues, in the alternative, that the ordinance is unconstitutionally vague. BGEA did not argue this issue to the court of appeals, and in its memorandum opposing the City's petition for review it asserted that "no constitutional issues * * * are at stake." Therefore, we decline to consider the argument. *See Putz v. Putz,* 645 N.W.2d 343, 350 (Minn.2002) ("Generally issues not raised below will not be considered on appeal."); *see also* Minn. R. Civ.App. P. 117, subd. 3 (stating that petitions for review shall contain a "statement of the legal issues sought to be reviewed").

ly or capriciously in designating the northeast portion of the District. Recently we ruled that cities are engaged in quasi-judicial action when they designate buildings for heritage preservation. *Handicraft Block Ltd. Partnership v. City of Minneapolis,* 611 N.W.2d 16, 24 (Minn. 2000). Because they are quasi-judicial acts, we affirm decisions to designate property as historic unless we make an independent determination that the decisions are unreasonable, arbitrary, or capricious. *See Honn v. City of Coon Rapids,* 313 N.W.2d 409, 416–17 (Minn.1981).

As we explained in *Zylka,* which party bears the burden of proof will depend on whether the City stated reasons for its decision—if the City gave contemporaneous reasons, BGEA bears the burden of proof, and if not, the City must prove it did not act unreasonably, arbitrarily, or capriciously. *Zylka v. City of Crystal,* 283 Minn. 192, 198–99, 167 N.W.2d 45, 50–51 (1969). In this case, the City did make contemporaneous findings to support its decision. Various levels of city government made formal, written findings concerning the District. The final written findings came from Zoning, which made findings of fact after its October 30 meeting. Looking at the record as a whole, including hearing transcripts and written memoranda, the City made its reasoning clear and public as to the District. Therefore, BGEA bears the burden of proving that the City acted arbitrarily, capriciously, or unreasonably in designating the District as historic.

BGEA asserts that the City's designation of the District's boundaries was arbitrary or capricious because specific properties were treated arbitrarily, expert testimony was arbitrarily dismissed, the City did not comply with its own ordinance, and the City treated BGEA differently than the University of St. Thomas.

We review the City's actions to determine whether they comport with the ordinance's criteria for historic designation. *See Honn,* 313 N.W.2d at 417 (noting that the arbitrariness inquiry in quasi-judicial actions focuses on whether the government action is in accord with the local ordinance). We note that the City's designation criteria require the City to exercise its judgment about whether an historical event or place is "significant" or associated with distinctive elements of city "identity" and other such subjective criteria.

*Specific Properties*

■ BGEA argues that the City gave no reason for including certain noncontributing properties in the District, while other noncontributing properties were excluded; that apartment buildings and surface parking lots should not have been included in the District; that the inclusion of only the part of building 13 facing Harmon Place was indicative of arbitrariness; and that no reasons were given to support the inclusion of the properties facing Hennepin Avenue.

Based upon our independent review of the record in this case, we cannot conclude that the City acted unreasonably, arbitrarily, or capriciously in designating properties to be included in the District. The City gave contemporaneous rationale to support the inclusion and exclusion of all the properties that BGEA contests. The findings issued by Zoning detail the reasons for including the properties facing Hennepin Avenue, designating the block including building 13, and retaining certain noncontributing properties in the District. The Zellie report supports the District's overall historic value and its comportment with the criteria in the ordinance. All necessary levels of city and state agencies approved the designation of this area as historic. The full District encompasses 31

buildings, the majority of which (23) an expert has deemed are contributing to the historic character of the area. Even the disputed northeast portion of the District has a reasonable number of contributing buildings (15 out of 20).

Some of BGEA's complaints stem from changes in the District's boundaries that were made by the City as the proposed historic designation made its way through various levels of city government. After receiving critiques of its larger, original proposed District, the City acted to ameliorate the economic effects of the designation on local property owners by splitting the District into two sections, whose combined area was significantly smaller than the original proposal. Downsizing the District and redrawing its boundaries was a rational response to the issues raised by property owners. In addition, it was rational for the City to include the areas with the highest concentration of contributing buildings (especially the buildings facing Harmon Place, the heart of the District) and to attempt to achieve recognizable boundaries for the historic District. We are concerned about the sufficiency of the reasons given for the inclusion in the District of only the part of building 13 facing Harmon Place and the Hennepin Avenue properties, given the somewhat marginal historic value of the northeast portion of the District. Nevertheless, evaluating the City's determinations in the light of an ordinance with subjective and broadly-defined criteria for designation, we cannot conclude that the City's decision-making was not rational. Therefore, we conclude that the City's decision to include or exclude certain properties within the District was supported by legally sufficient reasons and was not unreasonable, arbitrary, or capricious.

*Expert Evidence*

Next, BGEA criticizes the City's treatment of experts in the hearing process. It asserts that the City ignored Roise's opinions and that the City's failure to rebut Roise's report is evidence of an arbitrary decision. BGEA refers specifically to Roise's opinion that apartment buildings should not be included in the District, that vacant lots destroyed the cohesion of the District, and that many of the contributing buildings had undergone significant changes.

The court of appeals also expressed concern that the HPC acted against the recommendation of an expert, referring not to Roise but to the planning department staff. The appellate panel stated that "no reason was offered to reject the staff member's recommendation that the buildings facing Hennepin Avenue be excluded from the [District]." *Billy Graham,* 653 N.W.2d at 645. The court of appeals cited the rejection of the staff recommendation to exclude the properties facing Hennepin Avenue as a signal of an arbitrary act.

We recently touched upon the issue of experts in *Schwardt v. County of Watonwan,* 656 N.W.2d 383 (Minn.2003), and noted that local decisionmakers have discretion in weighing evidence. *Id.* at 388. Upon review, courts should not attempt to weigh the credibility of conflicting experts, but instead review the record to ensure that the decision was "legally sufficient," i.e., had support in the record. *See Barton Contracting Co. v. City of Afton,* 268 N.W.2d 712, 718 (Minn.1978) ("The standard for assessing conflicting evidence * * * [in quasi-judicial cases, is] not to weigh the evidence, but to review the record to determine whether there was legal evidence to support the zoning authority's decision."). *Cf. BECA of Alexandria, LLP v. County of Douglas,* 607 N.W.2d 459, 463 (Minn.App.2000); *BBY Investors v. City of Maplewood,* 467 N.W.2d 631, 635 (Minn.App.1991).

In this case the record shows that the City accepted all expert evidence that

was proffered and took the experts' opinions into consideration, in addition to the opinion of its staff. The experts gave conflicting testimony about the inclusion of various properties. For example, Zellie had included the Hennepin Avenue properties in her single district proposal while Roise had excluded them. Despite BGEA's contention that the HPC did not consider Roise's testimony, the record indicates that the planning department altered its recommendation for the District's boundaries in response to Roise's alternative proposal. Following Roise's lead, the planning department recommended the alley between Harmon Place and Hennepin Avenue as a boundary, excluded a significant number of noncontributing buildings, and carved out two smaller subdistricts. With the recommendations of Roise, Zellie, and the planning department in hand, the commissioners voiced their reasons for drawing the District's final boundaries. We conclude that the City acted appropriately in accepting and considering all expert testimony before reaching its decision, and there are sufficient facts in the record to support the City's decision.

*HPC's Obligation Under the City Ordinance*

■ BGEA alleges that procedural irregularities are evidence that the City act-

ed arbitrarily. Primarily, BGEA asserts the HPC failed to make findings sufficient to satisfy its obligation under the city ordinance.[7] BGEA argues that all findings should have come from the HPC, instead of from Zoning. Because some findings originated with Zoning, BGEA asserts the entire designation should fail for arbitrariness.

The HPC is required to make findings under Code § 599.280 (2001).[8] The HPC adopted some of the findings of the planning department, but did not add findings to justify including the Hennepin Avenue properties. Instead, Zoning developed findings to support the inclusion of the Hennepin Avenue properties. Thus, all findings did not originate with the HPC. We do not think the remedy for that failure, however, should be a judicial reversal of an historic designation that was approved by all levels of city government. There is no evidence that HPC's failure to make findings prejudiced BGEA. It was clear at the public meeting of the HPC on October 16 that the commission had voted to add the Hennepin Avenue properties back into the District; BGEA had notice of the HPC's recommendation to Zoning. Indeed, a lawyer from BGEA spoke at the Zoning meeting on October 30. There is nothing more BGEA could have done to

---

7. BGEA makes two other procedural arguments. The first is that the City did not make sufficient findings to stave off a presumption of arbitrariness, which we address above. BGEA's other argument is that it did not receive "meaningful notice" of the public hearings. Its argument lacks support in the record. The HPC complied with the notice provision of the ordinance, Code § 599.170 (2001) (mandating notice of the hearing be mailed at least ten days beforehand to all property owners within 350 feet of the district boundary). BGEA has cited no case law, ordinance, or statute indicating that the City's failure to provide notice in addition to that required by ordinance is evidence of an arbi-

trary designation, nor does it raise a constitutional claim that it was denied procedural due process.

8. The ordinance reads: "Following the public hearing, the [HPC] shall make findings with respect to the proposed designation and shall submit the same together with its recommendation to the zoning and planning committee of the city council." Code § 599.280 (2001). The language suggests that oral reasons given at the hearing are not sufficient, but more formal, written findings must be submitted to Zoning.

voice its opinion, even if the HPC had included specific findings about the Hennepin Avenue buildings' historic merit. Therefore, we conclude that the findings were sufficiently contemporaneous and adequate to support designating the entire northeast portion of the District.

### The University of St. Thomas

BGEA alleges they were situated similarly to another property owner, the University of St. Thomas (St. Thomas), whose properties within the originally proposed District were approved for demolition. BGEA notes that four of St. Thomas's buildings that were described as "contributing" in the Zellie report are now demolished, while the four BGEA buildings, three of which were "contributing," are still standing and part of the District. BGEA asserts that St. Thomas received vastly different treatment at the hands of the City than did BGEA, with no rationale for doing so in the record, a practice that is prohibited by our holdings in *Northwestern College*, 281 N.W.2d at 869, and *Hay v. Township of Grow*, 296 Minn. 1, 7–8, 206 N.W.2d 19, 23–24 (1973).

■ We have held in multiple cases that "[a] zoning ordinance must operate uniformly on those similarly situated." *Northwestern College*, 281 N.W.2d at 869; accord *Hay*, 296 Minn. at 7–8, 206 N.W.2d at 24. Disparate treatment of two similarly-situated property owners may be an indication that the local government is acting unreasonably or arbitrarily. *See Northwestern College*, 281 N.W.2d at 868–69.

In *Northwestern College*, two Christian colleges had applied for permits to expand their facilities. *Id.* at 867. The Arden Hills City Council denied Northwestern College's permit application, alleging that a college was incompatible with an area zoned for residential use. Two months earlier, however, the council had approved a permit for Bethel College, which was also a college building in an area zoned for residential use. We determined there was no reason to treat the two colleges differently, and reversed the denial of Northwestern College's permit application as arbitrary and a violation of due process. *Id.* at 869.

■ We do not agree that BGEA and St. Thomas were similarly-situated property owners who received disparate treatment. There were more similarities between Northwestern College and Bethel College than there are between BGEA and St. Thomas. In *Northwestern*, both applicants were Christian colleges, in the same type of zoned area, applying for very similar types of permits, and the city council approved one and denied the other within a span of two months. St. Thomas and BGEA are both nonprofit entities that owned contributing properties within the large district that Zellie originally proposed, but the similarities end there. BGEA chose to challenge the designation of the District in the first instance, which the City determines using the criteria in Code § 599.210.[9] St. Thomas did not challenge the inclusion of its property within the District, but instead requested a "certificate of appropriateness" from the HPC, which the City determines using criteria in Code § 599.350(b) (2001).[10] The standards

---

**9.** *See supra* note 1.

**10.** After the HPC proposed designation of the Harmon Place area, all buildings were subject to interim protection. Under interim protection, HPC

shall make findings that the destruction is necessary to correct an unsafe or dangerous condition on the property, or that there are no reasonable alternatives to the destruction. In determining whether reasonable alternatives exist, the commission shall con-

involved in deciding the two questions are divergent and make these property owners dissimilar in the type of relief sought. Because the appropriateness of demolition considers factors other than the contributing status of the property, these properties were not similarly situated.

In addition to the City reviewing BGEA's and St. Thomas's requests using different criteria, the properties of BGEA and St. Thomas were situated differently within the Harmon Place area. St. Thomas's buildings were concentrated on a block in which a very small area was taken up by contributing buildings, while BGEA's buildings, especially 11 and 12, were in the heart of the northeast subdistrict. We conclude that the City did not act arbitrarily in treating BGEA's and St. Thomas's buildings differently.

sider, but not be limited to, the significance of the property, the integrity of the property and the economic value or usefulness of the existing structure, including its current use, costs of renovation and feasible alternative uses. The commission [HPC] may delay a final decision for a reasonable period of time to allow parties interested in preserving the property a reasonable opportunity to act to protect it.

We conclude that the City of Minneapolis did not act arbitrarily or capriciously in designating the contested northeast portion of the District as historic. Under a higher standard of review we might reach a different result, given the somewhat marginal historic value of this area. Our decision is constrained by the significant deference that we accord the quasi-judicial actions of local governments and the broad and subjective criteria for historic designation set out in the ordinance.[11] Because the historic designation meets the criteria in the ordinance, the City made findings in favor of its decision, and the City's findings are supported by the record, we conclude the designation of the Harmon Place Historic District is neither unreasonable, arbitrary, nor capricious.

Reversed.

BLATZ, C.J., took no part in the consideration or decision of this case.

Code § 599.350(b) (2001).

11. While it is tempting to substitute our own judgment about the historic value of the District as the dissent does, the arbitrary and capricious standard of review prohibits us from engaging in that assessment.

APPENDIX

GILBERT, Justice (concurring in part, dissenting in part).

I concur that a historical district can include some noncontributing properties and that the standard of review is arbitrary and capricious. However, I respect-fully dissent from the majority's holding that the City did not act arbitrarily or capriciously in this case and would affirm the court of appeals.

This designation procedure hinges on a report (Zellie Report) prepared by the City's commissioned consultant, Carole

Zellie (consultant). This consultant studied a section on the southern edge of downtown Minneapolis, where the City's automotive industry flourished from around the turn of the century to the 1950s. The consultant ultimately recommended that the area be designated a historic district. However, the Zellie Report contains a significant flaw—it ignores the historical and physical change that has occurred in this district since the late 1950s when the auto industry vacated this area. While the Zellie Report concedes that the auto industry era began in 1907 and ended in 1957 with "its dispersal to the suburbs," the report represents a nostalgic summary of a bygone era and is written as if there had been no change in this area since the 1950s. The Zellie Report carries forward the history of this bygone era without taking into consideration the end of the era and the transformation of the district by the time it was being considered for historical designation.

The current configuration of this district doesn't even come close to resembling "the hub of the automotive sales district in Minneapolis at the beginning of the 20th Century." Redevelopment began with the I–94 freeway construction in 1965. Many of the auto-related buildings in this area have also been demolished and replaced by twelve surface parking lots. There are at least seven new buildings within the district, four apartment buildings and three buildings that haven't been substantially remodeled. The automotive industry was eventually replaced by major educational and religious institutions and multiple housing.

The most significant change in the district came in the "super block" area, which clearly divided the automotive industries' concentration into two distinct areas. The super block area contains major new structures that now cater to higher education and cover over two square blocks.[1] It houses what is now known as the Minneapolis Community and Technical College. Notwithstanding the complete changeover in this two-block area, the consultant recommended that these buildings be included in this historical district. Wisely, the City planning department rejected this part of their expert's recommendation and excluded this super block from historical designation. As a result, the planning department revision split the district into two portions commonly known as the Fawkes block and the northeast portion.[2] It is the northeast portion of the district, which is the subject of this appeal.

Considerable changes have taken place in the northeast section of the district since the late 1950s. For instance, substantial religious institutions emerged in this area. In 1914, across the street from this designated area, the Basilica of St. Mary's Church was constructed. At the north end is the First Baptist Church. Then, the Northwestern Bible and Train-

1. In 1977, the Minneapolis Technical College was completed at 1415 Harmon. In 1977, the Minneapolis Community College was completed at 1501 Hennepin Avenue. In 1979, the Metropolitan Junior College became the Minneapolis Community College. Furthermore, both the Irene Hixon Whitney Fine Art Center (1989) and the Phillip Helland Center (1986) were opened in this area.

2. In splitting this district, the City left the Fawkes block intact. This block had not undergone the same extensive demolition and renovation that has occurred in the balance of the proposed district. In fact, of the original eleven properties in the Fawkes' section, eight of these were designated as contributing properties (buildings 19, 20, 28, 30, 32, 33, 34 and 35). Building number 18 was deemed to be noncontributing because it had been extensively renovated after its original construction in 1946. Building 29 was also deemed to be noncontributing because it was a hotel constructed in 1900 and number 31 was deemed to be noncontributing because it was constructed in 1947, even though it was an addition to building 32, which was indeed part of the Fawkes Auto Company salesroom and garage.

ing School was developed here in the 1940s and 1950s. Subsequently, the Billy Graham Association purchased and occupied five buildings in the district beginning in 1950 (buildings 11, 12, 13, 25 and 27). Finally, to complete this cycle, the University of St. Thomas (St. Thomas) campus acquired large portions of the historically designated district and was permitted to demolish five buildings in this area and expanded the downtown campus. This activity began in 2001 and continued through the final historical designation process.

In 1971, the City of Minneapolis zoned the northeast portion high density, multiple residential housing and established the Loring Park Redevelopment District. Thirty-six of the 42 buildings in this area were razed. They were replaced by the Loring Greenway developed in 1976, 43 Greenway Gables town homes in 1980, and the Laurel Village developed in 1986. Four older apartment buildings (buildings 6, 36, 37 and 39) are also part of the northeast section.[3] At the time the consultant issued the Zellie Report there was also one hotel in the northeast section (building 26).[4]

If the City had commenced this historical designation back in 1971, at or about the time the historical district designation was first authorized by the legislature, it might be a different situation. *See* Act of April 22, 1971, ch. 128, 1971 Minn. Laws 253, 253–54 (codified at Minn.Stat. § 471.193 (1974)). However, after all of this redevelopment activity, only twelve buildings in the northeast portion of this historical district can legitimately be classified as auto industry related (buildings 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 23 and 36).

Although buildings 2, 25 and 37 were designated as contributing, that characterization is inaccurate. Buildings 2 and 39 were demolished by St. Thomas, building 25 underwent extensive renovations, and building 37 is an apartment building. The remaining twelve contributing properties represent less than 30 percent of the surface area of those initially recommended in the northeastern section of the historical district, two of which are apartment complexes (buildings 6 and 36).

As pointed out by a unanimous panel of the court of appeals, the City's planning commission essentially redrew the boundaries that were recommended by the paid consultant and by the City planning department staff. *See Billy Graham Evangelistic Assoc. v. City of Minneapolis*, 653 N.W.2d 638, 645 (Minn.App.2002). It is in redrawing these boundaries that the City acted in an arbitrary and capricious manner. First, the inclusion of the Hennepin Avenue properties, buildings 21 though 25, within the district is arbitrary and capricious. The City included the Hennepin Avenue properties within the district despite the planning department's recommendation to exclude the properties because "[t]his portion of Hennepin Avenue frontage possesses a different character and development potential than the remainder of the district." *See* Minneapolis, Minnesota, Code of Ordinances (Code) § 599.280 (2001) ("In making its findings and recommendation, the commission shall consider * * * the city planning commission's comments"). Moreover, when the Heritage Preservation Commission of the City of Minneapolis (HPC) decided to include the Hennepin Avenue properties

---

**3.** It appears the Zellie Report included the apartment buildings as contributing properties solely because they had been built between 1907 and 1930 and had "co-existed with the automotive district."

**4.** Building 26 is outside of the final boundaries established by the City.

within the district, it failed to make findings explaining its decision to ignore the planning department's recommendation and redraw the boundaries. *See* Code § 599.280 ("[f]ollowing the public hearing, [HPC] shall make findings with respect to the proposed designation"). Failing to follow procedural guidelines is an indicator that the City acted in an arbitrary manner. *See Amcon Corp. v. City of Eagan,* 348 N.W.2d 66, 75 (Minn.1984) ("The city's own comprehensive plan and map designate the property at issue as roadside business. While this designation is not binding, a refusal to zone accordingly is evidence that the city is acting in an arbitrary manner."). While the zoning and planning committee (zoning) ultimately made written findings justifying the inclusion of the Hennepin Avenue properties, these findings were largely conclusory. Zoning found that two of the five properties are classified as contributing properties and "[i]ncluding the properties within the historic district will help to preserve the integrity of these buildings and the character of the district." Such conclusory findings mitigate against a finding that the City acted in a reasonable manner. *See Historic Green Springs, Inc. v. Bergland,* 497 F.Supp. 839, 850–51 (E.D.Va.1980) (stating that conclusory findings provide minimal insight into whether a decision is arbitrary or capricious).

The arbitrary nature of the decision to include the Hennepin Avenue properties within the district is further illustrated by the fact that the Zellie Report designated only two of the five Hennepin Avenue buildings as contributing. Additionally, both of these "contributing" buildings have lost much of their historical value as they have "undergone varying degrees of alteration, including modernization of windows, redesign of building entrances or blocking of original window openings." The majority admits that the northeast portion has a "somewhat marginal historic value." Thus, this "combination of danger signals"—ignoring its own committee's recommendation, lack of findings and marginal historical value suggest that the City acted arbitrarily when it included the Hennepin Avenue properties in the district. *See Cable Communications Bd. v. Nor-West Cable Communications P'ship,* 356 N.W.2d 658, 669 (Minn.1984) ("The court will intervene, however, where there is a 'combination of danger signals which suggest the agency has not taken a "hard look" at the salient problems' and the decision lacks 'articulated standards and reflective findings.' ") (quoting *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn.1977)) (internal citations omitted).

Another indicator that the City acted arbitrarily and capriciously in designating the district historic is that the City bisected building 13 so that it is partially within and partially without the designated district, even though both parts of the building are designated noncontributing. Discussing building 13, the majority concludes that "[w]e are concerned about the sufficiency of the reasons given for the inclusion in the District of only the part of building 13 facing Harmon Place * * * given the somewhat marginal historic value of the northeast portion of the District." Nevertheless, the majority determines that the City's bisection of building 13 was rational.

The commission failed to make findings as to why it bisected building 13, or why this decision is rational. The only finding with respect to building 13 was made by the City planning committee that stated buildings 2, 4, 6, 8, 10, 12, and 13 should be included in the district because all "but one" contribute to the district. However, none of the various government agencies articulated any findings with respect to why building 13, which is located at the

end of the row and is noncontributing, was included in this group. Additionally, there are not any findings relating to why building 13 was bisected when the entire building is noncontributing. Where an entire building has been designated noncontributing, to designate only one part of the building historic is per se arbitrary, where the City failed to make any findings to justify its decision. *Cf. Amcon Corp. v. City of Eagan*, 348 N.W.2d 66, 75 (Minn. 1984) (holding that "[t]he failure of the city to advance any rationale for not following its comprehensive plan and not granting RB classification is strong evidence of arbitrary action").

The inclusion of building 13 in the historic district at all is inexplicable considering that the building was constructed in 1980 and in light of the City's decision to exclude from the district buildings 15 and 17, which are also newly constructed, nonconforming buildings. Accordingly, the City excluded two new properties from the district and included a portion of one new property in the district without articulating a basis in the record to explain why these buildings should be treated in a different manner. Importantly, none of these buildings were associated with the automobile industry in any manner. There is no basis to support this disparate treatment.

The City also acted arbitrarily when during the designation process it allowed St. Thomas to demolish four contributing properties that were originally in the northeast portion (buildings 2, 39, 41 and 42), and then removed the entire parcel owned by St. Thomas from the district. In allowing St. Thomas to demolish buildings, the City treated similarly situated properties differently. As BGEA points out, "[t]he City freed St. Thomas from the restrictions of historic designation but imposed those restrictions [on BGEA]." It is

well established that "[a] zoning ordinance must operate uniformly on those similarly situated." *Northwestern College v. City of Arden Hills*, 281 N.W.2d 865, 869 (Minn. 1979). The majority concludes that BGEA and St. Thomas are not similar because St. Thomas requested a "certificate of appropriateness" instead of challenging the designation of the district. Thus, the majority concludes that "[t]he standards involved in deciding the two questions are divergent and make these property owners dissimilar in the type of relief sought." However, BGEA and St. Thomas are actually quite similar. They are both nonprofit entities that owned contributing properties within the large district originally proposed by the Zellie Report. Allowing the contributing buildings owned by St. Thomas to be demolished while including similar noncontributing buildings owned by BGEA within the district is per se disparate treatment. Thus, based on this record, the City did act in an arbitrary and capricious manner in treating similarly situated properties differently by allowing the demolition of contributing properties while including noncontributing property.

Finally, although I agree that some noncontributing property can be included within a historical district, those properties should not predominate over contributing properties. Further, noncontributing properties should only be included when they add value or support the architecture of the district. Building 13 adds nothing to the historic or architectural significance of this district. It is a special use, single-user-type of building that has now been stripped of its value and may even be rendered unusable. This arbitrary and capricious action of the City should not be condoned by this court nor should we give our approval to this unbounded exercise of significant governmental power just short of a "taking" in an eminent domain context. The "constrain[t]" and "deference"

the majority accords the City in this appeal amounts to an abdication of our judicial power. The majority's decision rubber stamps a defective, disparate and improper use of governmental power. If this action by the City is not arbitrary and capricious, what is? We must draw the line somewhere. In doing so, we are not substituting "our own judgment about the historic value of the District" as the majority opinion states, but rather exercising our independent legal judgment to ensure that another branch of government conducts its business according to the law, rather than according to its whim or wishes.

HANSON, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Gilbert.