BILLY GRAHAM EVANGELISTIC ASSOCIATION, Relator,

v.

CITY OF MINNEAPOLIS, Respondent.

No. C1-01-2127.

Court of Appeals of Minnesota.

Oct. 8, 2002.

Richard D. Snyder, Fredrikson & Byron, P.A., Minneapolis, MN, for relator.

Jay M. Heffern, Minneapolis City Attorney, Carol Lansing, Assistant City Attorney, Timothy S. Skarda, Assistant City Attorney, Minneapolis, MN, for respondent.

Considered and decided by G. BARRY ANDERSON, Presiding Judge, HALBROOKS, Judge, and PARKER, Judge.[*]

## OPINION

G. BARRY ANDERSON, Judge.

Relator Billy Graham Evangelistic Association owns several properties in the Harmon Place area of Minneapolis. The Minneapolis Heritage Preservation Commission recommended, and the Minneapolis City Council approved, a historic district that includes a number of realtor's properties. By writ of certiorari, relator challenges the city's designation. Because we conclude the city's designation of the Harmon Place Historic District was arbitrary and capricious, we reverse.

## FACTS

In November 2001, the Heritage Preservation Commission (commission) of the City of Minneapolis (city) directed the city's planning department to begin a study to determine whether the Harmon Place area of the city should be designated as a historic district.[1] The planning department hired Carol Zellie of Landscape

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

1. Once the commission decided to commence a designation study of the proposed district, all of the property within the proposed district could not be altered. *See* Minneapolis, Minn., Code of Ordinances § 599.240(a)-(c) (2001) (establishing interim protections for properties during a designation process). This prohibition remains (1) until the city council makes a decision regarding the proposed district or (2) for twelve months, whichever comes first. *Id.* Furthermore, the scope of the prohibition is expansive, requiring a certificate of appropriateness for even minor alterations. *Id.* Therefore, the owner's property rights in the Harmon Place area were substantially affected long before the area was designated as a historic district by the city council.

Research to prepare a designation study. (Zellie Report).[2]

The Zellie Report found that the Harmon Place area met the designation criteria in the Minneapolis code of ordinances and proposed a Harmon Place Historic District (HPHD). The Zellie Report concluded that the HPHD would meet two separate criteria for designation as a historic district. First, the report stated that HPHD would qualify for designation as a historic district because, [t]he property is associated with significant events or with periods that exemplify broad patterns of cultural, political, economic or social history.[3] The report concluded that,

> Harmon Place and the adjacent blocks of Hennepin Avenue were the heart of the Minneapolis automotive district for over fifty years, and twenty-two of the twenty-six contributing properties are auto-related. The buildings along Harmon Place and Hennepin Avenue include many of the city's best remaining examples of a vital industry that engaged thousands of entrepreneurs, workers and customers. The twenty-two contributing buildings, most with good exterior integrity, reflect the roller-coaster progress of the early automotive industry and the twentieth-century economy as both evolved at the edge of downtown Minneapolis.

Second, the Zellie Report found that the HPHD would also qualify as a historic district because [t]he property embodies the distinctive characteristics of an architectural or engineering type or style, or method of construction.[4] The report found this criteria had been met because: (1) there was a specific building type addressed in the HPHD; (2) certain apartment buildings reflected early twentieth-century design long associated with Harmon Place; and (3) the historic district boundaries reflect the general edges and sense of place long associated with the core of the city's automotive district.

But the Zellie Report also recognized that, within the district, there were sixteen (out of the proposed forty-two) non-contributing properties. In other words, some properties had little connection to the historical significance of the HPHD "due to their construction before or after the district's period of significance or the extent of exterior alterations."

After Zellie completed her report, the city planning department sent a letter to Harmon-area property owners explaining that a consultant's report had been completed and that anyone could receive a copy of the report. The letter also emphasized that a historic district had been proposed and that a public hearing would be held in August 2001. On May 15, 2001, Zellie presented her report to the commission. The commission appears to have directed the city planning commission to continue with the designation process.

The city-planning director then sent the Zellie Report to the State Historic Preservation Officer (SHPO) for comment.[5] On July 11, 2001, the SHPO concluded that

---

2. The Harmon Place area was protected by the Harmon Area Overlay District pursuant to Minneapolis, Minn., Code of Ordinances § 551.970 (2001), which provided restrictions on the height and size of new property development. All other references to the Minneapolis, Minn., Code of Ordinances are to the 2001 version of the ordinances.

3. Minneapolis, Minn., Code of Ordinances § 599.210(1).

4. Minneapolis, Minn., Code of Ordinances § 599.210(4).

5. See Minneapolis, Minn., Code of Ordinances § 599.250 (requiring review by the State Historic Preservation Officer).

the HPHD "is eligible for local designation under Designation Criteria 1 and 4."

The city planning commission then began to review the proposed designation.[6] City planning staff recommended the city planning commission adopt the staff's findings, which included the finding that the HPHD was qualified for designation as a historic district. On August 6, 2001, the city planning commission adopted the staff's findings and sent its recommendation to the commission.

But before the commission held a meeting, the planning department staff submitted a second report. It appears that this second report responded to criticism regarding the originally proposed district. The second report recommended markedly different boundaries for the HPHD, including the exclusion of certain properties facing Hennepin Avenue and the exclusion of a larger block, which includes the Minneapolis Community College. The second staff report documents the city council's approval of the University of St. Thomas's appeal, which allowed the university to demolish several buildings in the originally proposed HPHD.

On September 25, 2001, the commission held a special meeting and public hearing.[7] The hearing, in large part, addressed the designation of the HPHD. In response to the Zellie Report, Charlene Roise, a consultant hired by relator, offered the commission a reassessment of the proposed HPHD. Roise recommended that the commission reconsider the boundaries of the HPHD, arguing that several factors seriously undermined the integrity of the proposed district, including: (1) the inclusion

of the larger block that included the Minneapolis Community College was an error because those buildings lack "the functional connection of Harmon Place or any visual connection"; (2) the northeast section of the HPHD was problematic because of non-contributing properties and vacant lots; and (3) the inclusion of certain apartment buildings was not appropriate because those buildings had nothing to do with the development of the automotive industry. Roise suggested new boundaries that were smaller than those suggested by the planning department's second staff report.

After Roise's presentation, several community members spoke against the proposed designation. Residents and building owners complained about the restrictions created by historic designation and about lack of notice regarding the designation process. The commission moved to designate the district but the motion failed due to a tie vote among the commissioners. The commission continued the proposed designation to October 16, 2001, its next scheduled business meeting.

At the next meeting, the commission accepted the planning department staff's recommended boundaries in its second report, but one commissioner sought to include two buildings facing Hennepin Avenue designated as buildings 23 and 25. A planning department staff member present explained that the buildings could not be designated individually. The commission then adopted its own version of the proposed HPHD and included buildings 21 through 25 in the HPHD. The commission then recommended that the zoning and planning committee of the city council ap-

6. According to Minneapolis, Minn., Code of Ordinances § 599.260, the city planning commission must consider three factors, including the relationship of the designation to the city's comprehensive plan, and the effect of the designation on the surrounding area.

7. See Minneapolis, Minn., Code of Ordinances § 599.270 (requiring a public designation hearing).

prove the designation of the HPHD with its proposed boundaries.

On October 30, 2001, yet another Minneapolis planning committee, the zoning and planning committee (ZPC) met and adopted the commission's findings. The ZPC also directed the planning department staff to develop findings to justify inclusion of buildings 21 through 25. The ZPC then passed the recommendation on to the city council for final approval; this recommendation included findings supporting inclusion of buildings 21 through 25. On November 9, 2001, the city council passed resolutions 2001R–482 and 2001R–483, which were the HPHD designations,[8] and the mayor approved the resolutions on November 15, 2001.

On December 10, 2001, relator filed a writ of certiorari with this court challenging the city council's designation of the HPHD.

## ISSUE

Was the city's designation of the Harmon Place Historic District arbitrary and capricious?

## ANALYSIS

Relator argues that respondent's decision to designate the HPHD as a historic district was arbitrary and capricious because respondent: (1) treated similarly situated contributing property inconsistently by not including some contributing property and allowed the University of St. Thomas to demolish other contributing property; (2) treated similarly situated non-contributing property differently by including some properties although they could have

easily been left out of the district; (3) included certain properties facing Hennepin Avenue, although those properties had undergone substantial renovations and should have been described as non-contributing; (4) included non-contributing apartment buildings in the district; (5) included parking lots in the district; and (6) allowed procedural irregularities in the designation process, including the failure to make findings concerning why certain properties where included or excluded and by failing to allow more public participation in the designation process.[9]

Realtor's arguments fall into two categories: (1) respondent's choices to include or exclude properties from the historic district are arbitrary and capricious; and (2) the process was flawed because of lack of public participation and the lack of findings.

### A. Background of Historical–Designation Ordinances

The state legislature has enabled a municipality to establish commissions "to preserve and promote its historic resources." Minn.Stat. § 471.193, subd. 2 (2000). The commission's powers are limited to "those delegated or assigned by the ordinance establishing the commission." Id., subd. 3. Minneapolis, Minn., Code of Ordinances title 23, chapter 599, establishes the commission and outlines its duties. The commission itself cannot designate buildings as historic landmarks. Instead, Minneapolis, Minn., Code of Ordinances § 599.120(b)(4) states that the commission shall "hear and make recommendations to the city council

---

8. There are two designations, one for each portion (southwest portion or Fawkes block and northeast portion, which includes relator's properties) of the HPHD.

9. Relator does not challenge the propriety of the Fawkes block as a portion or subdivision of the district. This block is bordered by Hennepin Avenue, Harmon Place, and Maple Street. Therefore, we do not address the appropriateness of that portion of the district.

on the proposed designation of landmarks and historic districts."[10]

The commission recommended that the HPHD be designated as a historic district, which is defined as

[a]ll property within a defined area designated as an historic district by the city council because of the historical, cultural, architectural, archaeological or engineering significance of the district, or designated as an historic district by state law.

Minneapolis, Minn., Code of Ordinances § 599.110. "Property" is defined as "[a]ny land, building, structure or object, surface or subsurface area, natural or landscape feature." *Id.* Finally, the heritage-preservation ordinance states that the commission must use certain criteria in evaluating a proposed designation:

The following criteria shall be considered in determining whether a property is worthy of designation as a landmark or historic district because of its historical, cultural, architectural, archaeological or engineering significance:

(1) The property is associated with significant events or with periods that exemplify broad patterns of cultural, political, economic or social history.

* * * *

(4) The property embodies the distinctive characteristics of an architec-

tural or engineering type or style, or method of construction.

Minneapolis, Minn., Code of Ordinances § 599.210(1), (4).

### B. Standard of Review of Designation Decision

A city's historical-preservation-designation proceedings are quasi-judicial in nature and reviewable by this court by writ of certiorari. *Handicraft Block Ltd. P'ship v. City of Minneapolis,* 611 N.W.2d 16, 24 (Minn.2000). The standard for review of a governmental zoning decision is whether it was unreasonable, arbitrary, or capricious. *See Carl Bolander & Sons Co. v. City of Minneapolis,* 502 N.W.2d 203, 207 (Minn.1993); *Swanson v. City of Bloomington,* 421 N.W.2d 307, 313 (Minn. 1988) ("The standard of review is whether the [council's] decision was unreasonable, arbitrary or capricious, with review focused on the legal sufficiency of and factual basis for the reasons given."); *Van-Landschoot v. City of Mendota Heights,* 336 N.W.2d 503, 508 (Minn.1983) (holding that the general standard of review for quasi-judicial zoning decisions is whether the action was arbitrary and capricious); *In re Quantification of Envtl. Costs,* 578 N.W.2d 794, 799 (Minn.App.1998) ("On writ of certiorari, we determine whether [the city] * * * erred as a matter of law, issued a decision unsupported by substantial evidence, or acted arbitrarily or capri-

---

10. The complex designation procedure used by respondent is as follows: First, a designated person nominates a piece of property or historic district for designation. Minneapolis, Minn., Code of Ordinances § 599.220. Second, the commission makes an initial determination whether the property meets the criteria for designation. Minneapolis, Minn., Code of Ordinances § 599.230. Third, the planning director submits the proposed designation to the State Historical Preservation Office (SHPO) for review. Minneapolis, Minn., Code of Ordinances § 599.250. Fourth, the planning director submits the proposed designation to the city planning commission for review and comment. Minneapolis, Minn., Code of Ordinances § 599.260. Fifth, the commission holds a public designation hearing. Minneapolis, Minn., Code of Ordinances § 599.270. Sixth, the commission makes a recommendation to the zoning and planning committee of the city council. Minneapolis, Minn., Code of Ordinances § 599.280. Finally, the city council receives a recommendation from the zoning and planning committee and makes a final decision on designation. Minneapolis, Minn., Code of Ordinances § 599.290.

ciously." (quotation omitted)), *review denied* (Minn. Aug. 18, 1998).

## C. Arbitrary and Capricious Decision

■ We are sympathetic to the difficult challenge facing the Minneapolis City Council as it attempts to protect historic properties in the city. Those efforts, however, are subject to constraints imposed by both the Minnesota and the United States constitutions, which protect private property rights. U.S. Const. amend. V; Minn. Const. art. 1, § 13.[11] But we will overturn a municipality's historic-district designation only when that decision is unreasonable, arbitrary, or capricious. *Honn v. City of Coon Rapids*, 313 N.W.2d 409, 416–17 (Minn.1981).

■ A city's zoning decision is arbitrary and capricious when it is "based on whim or is devoid of articulated reasons." *In re Proposal by Lakedale Tel. Co.*, 561 N.W.2d 550, 553 (Minn.App.1997) (quotation omitted). Although we will intervene where the absence of findings or reasoning in the record indicates the city's failure to address an issue, we will affirm the decision if the record shows the agency or city engaged in reasoned decision making. *Cable Communications Bd. v. Nor–West Cable Communications P'ship*, 356 N.W.2d 658, 669 (Minn.1984).

The supreme court has recognized the differences

> between zoning matters which are legislative in nature (rezoning) and those which are quasi-judicial (variances and special use permits). Even so, the standard of review is the same for all zoning matters, namely, whether the zoning au-

thority's action was reasonable. Our cases express this standard in various ways: Is there a "reasonable basis" for the decision? or is the decision "unreasonable, arbitrary or capricious?" or is the decision "reasonably debatable?"

*Honn*, 313 N.W.2d at 416–17.

We examine the controlling ordinance to determine whether the governmental entity's decision was unreasonable or arbitrary and capricious. *White Bear Docking & Storage, Inc. v. City of White Bear Lake*, 324 N.W.2d 174, 176 (Minn.1982). The controlling ordinance is Minneapolis, Minn., Code of Ordinances § 599.210, which provides the historic-designation criteria. The commission agreed with the staff's recommendation and found that the HPHD met the required designation criteria.

■■ But the commission redrew the boundaries recommended by the city planning department's staff so that buildings 21 through 25 were included in the district. And those buildings were included even though the string of buildings facing Hennepin Avenue included a building that was constructed before the beginning of the auto district's period of significance. Additionally, one other "contributing" building facing Hennepin Avenue had undergone substantial alterations. When making its decision, a municipality "may not reject expert testimony without adequate supporting reasons." *SuperAmerica Group, Inc. v. City of Little Canada*, 539 N.W.2d 264, 267 (Minn.App.1995), *review denied* (Minn. Jan. 5, 1996). Nonexperts "may offer adequate reasons to counter or reject expert opinions, but

11. It is easy to lose sight of the importance of these constitutional protections. Private property is a constitutional bulwark and at least one commentator has noted the relationship between private property and freedom. "What our generation has forgotten is that the system of private property is the most important guaranty of freedom, not only for those who own property, but scarcely less for those who do not." F.A. Hayek, *The Road to Serfdom* 115 (University of Chicago Press 1994) (1944).

those reasons must be concrete and based on observations, not merely on fear or speculation. *Trisko v. City of Waite Park,* 566 N.W.2d 349, 356 (Minn.App.1997), *review denied* (Minn. Sept. 25, 1997).

■ Here, no reason was offered to reject the staff member's recommendation that the buildings facing Hennepin Avenue be excluded from the HPHD; at the commission's October 16, 2001 meeting, some council members expressed concern about the inclusion of buildings 21 through 25. There was no indication on behalf of the commission as to why the buildings facing Hennepin Avenue should be included other than the fact that the commission wanted to "stop the bleeding" and retain as much area for the district, even if buildings in the retained area facing Hennepin Avenue were non-contributing properties.

Other facts in the record also demonstrate the arbitrary and capricious nature of the city's district designation. The HPHD, as it currently stands, includes only a portion of relator's non-contributing property located at 1308–12 Harmon Place (building 13), which was constructed around 1980. Relator's property at 1301 Hennepin Avenue (building 27) abuts building 13, yet it is entirely outside the historic district. The record indicates that an old brick alley used to run from 11th Street South to Spruce Place, dissecting the blocks between Hennepin Avenue and Harmon Place. It appears that the planning staff attempted to use this alley as a line of demarcation, marking the northern boundary of the proposed HPHD. But when the commission chose to include buildings 21 through 25, the alley's importance necessarily diminished.

Furthermore, the portion of the old brick alley that formerly ran between 13th Street South and Spruce Place has been paved over; it presently has no significance to the district. The partial inclusion of building 13 reflects the commission's unexplained use of the alley as a boundary for some purposes, such as inclusion of the southern half of building 13, but not for other purposes, such as the inclusion of buildings 21 through 25 that lie north of the alley. The record is devoid of articulated reasons explaining why certain non-contributing properties were included based on the use of the alley as a boundary, yet other similarly situated properties were excluded. *See In re Proposal by Lakedale Tel. Co.,* 561 N.W.2d at 553. The unexplained use of the alley as a boundary in the overall designation of the district was nothing more than an arbitrary act on the behalf of the commission because it is not supported by legally sufficient reasons. *See, e.g., Amcon Corp. v. City of Eagan,* 348 N.W.2d 66, 75 (Minn. 1984) (failure to advance rationale for zoning decision indicates arbitrary action); *Arcadia Dev. Corp. v. City of Bloomington,* 267 Minn. 221, 227–28, 125 N.W.2d 846, 851 (1964) (holding that city's denial of variance from sign-standards ordinance was arbitrary and capricious); *Rostamkhani v. City of St. Paul,* 645 N.W.2d 479, 485–86 (Minn.App.2002) (city council's failure to consider property owner's letter, which expressed owner's intent to take remedial action, amounted to arbitrary and capricious act, requiring reversal and remand); *Picha v. County of McLeod,* 634 N.W.2d 739, 743 (Minn.App.2001) (reversing county's denial of conditional-use permit for private cemetery because county had no legally sufficient reason to deny permit); *Trisko,* 566 N.W.2d at 357 (city council's denial of CUP to operate a rock quarry on property zoned for that purpose was unreasonable, arbitrary, and capricious because decision was legally insufficient and lacked a factual basis in record).

Relator also argues that the procedure the city used was flawed and therefore led

to an arbitrary and capricious district designation. But because we have concluded that the designation itself was arbitrary and capricious, we need not address relator's procedural-irregularities argument.

Therefore, we conclude that the commission's proposed designation, and therefore the city's acceptance of that designation, was arbitrary and capricious. Furthermore, we are not required to remand where a zoning authority's decision is arbitrary because it is unsupported by legally sufficient reasons. *Interstate Power Co., Inc. v. Nobles County Bd. of Comm'rs,* 617 N.W.2d 566, 577–79 (Minn.2000); *N. States Power Co. v. Blue Earth County,* 473 N.W.2d 920, 923 (Minn.App.1991), *review denied* (Minn. Oct. 11, 1991).

## DECISION

Because the Minneapolis city council's designation of the Harmon Place Historic District was arbitrary and capricious, we reverse the designation and decline to remand the matter.

**Reversed.**