Roselawn CEMETERY, Appellant,

v.

CITY OF ROSEVILLE, Respondent,

Roseville Neighbors for Responsible Growth, intervenor, Respondent.

No. A04–672.

Court of Appeals of Minnesota.

Nov. 23, 2004.

256

Thomas J. Radio, Hinshaw & Culbertson L.L.P., Minneapolis, MN, for appellant.

George C. Hoff, Justin L. Templin, Hoff, Barry & Kuderer, P.A., Eden Prairie, MN, for respondent City of Roseville.

Thomas H. Goodman, Siegel, Brill, Greupner, Duffy & Foster, P.A., Minneapolis, MN, for respondent Roseville Neighbors for Responsible Growth.

Considered and decided by SCHUMACHER, Presiding Judge; STONEBURNER, Judge; and PARKER, Judge.*

## OPINION

ROBERT H. SCHUMACHER, Judge.

Appellant Roselawn Cemetery challenges the district court's entry of summary judgment in favor of respondent City of Roseville arguing the city acted arbitrarily, capriciously, or unreasonably when it denied Roselawn a conditional use permit to build a crematorium at its existing location. We affirm.

## FACTS

In May 2001, Roselawn submitted an application to the city for a conditional use permit to place an 1800–square–foot crematorium on its property. Roselawn is located on the northeast corner of Larpenteur Avenue and Victoria Street in Roseville. Roselawn is bordered to the north by "Reservoir Woods" and by residential homes to the east. A reservoir that provides the City of Saint Paul with water lies approximately 2,500 feet northeast of Roselawn. Roselawn's property is in an area zoned R–1. Under the city's zoning ordinances, operation of a crematorium in an R–1 area requires a conditional use permit.

In July 2001, the Roseville Planning Commission voted to recommend approval of the conditional use permit subject to certain conditions and the matter was forwarded to the city council. Approximately two weeks later, the Roseville City Council held an open meeting to discuss Roselawn's application. The city requested Anne Jackson, an engineer with the

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

Minnesota Pollution Control Agency, Ernie Czirok from All Crematory—a major supplier of crematory furnaces—and two individuals from the nearby Forest Lawn Crematorium attend the meeting.

Included in the record before the city council was a report from Industrial Equipment & Engineering Co., which described the regulated pollutants emitted from crematoriums. The report stated that regulated pollutants include carbon monoxide, hydrogen chloride, and metals (mercury, lead, cadmium), all of which can be toxic to the human body in high doses. The report also stated that crematoriums emit dioxins and furans, which "are quite hazardous even in relatively small amounts." Additional materials submitted to the city council stated that the cremation of persons who have received brachytherapy, a type of cancer treatment, would emit radioactive material.

The likely emission of mercury from the crematorium was discussed at length during the meeting. Jackson stated that mercury is "not toxic to you as you first get it, the problem is, it builds up in our environment, and its presence in the environment is the problem we face." Jackson also stated that there is no "readily acceptable method of adding control equipment to the crematory itself to deal with mercury." When questioned about the long-term effect of mercury build-up, Jackson stated, "Mercury is a neurotoxin. At very low thresholds we're concerned about the fetal development in pregnant women."

A resident, who formerly worked in the safety equipment industry, presented tables from "a quasi-government agency called the Congress of Industrial Hygienists." According to these tables, both mercury and hydrogen chloride "are considered to be IDHL, immediately dangerous to health and life." The resident also testified that under the statistics provided to the city, the crematorium would release 22 pounds of hydrogen chloride per year and 1/3 of a pound of mercury per year. Another resident, referring to table listing the EPA's drinking water standards, stated, "Dioxins they prefer to see as a goal, zero, as the amount in drinking water, and . . . [.]000003 parts per million is the maximum allowed."

During the meeting, there were questions raised regarding the radioactive particles that would result from the cremation of persons who had received brachytherapy. Brachytherapy is a procedure used to treat cancer where radioactive "seeds" are implanted in or around a cancerous tumor. Patrick Hogan of the Forest Lawn Memorial Park Crematorium stated that his crematorium has never had any problem with radioactive particles because no cremations are performed until the "controller" of the body to be cremated signs an authorization stating that there is no radioactive material in the body. But a local resident whose husband had recently been cremated stated, "Nobody asked me if there was any radioactive material. He died of cancer. So it's not always done."

In August 2001, the city council voted to deny Roselawn a conditional use permit, finding that the emission of pollutants from the crematorium will negatively affect the character of the neighborhood and that there is an inability to fashion practical terms and conditions for the proposed use to protect the general public health, safety and welfare of the neighborhood and community. The city council made the following findings:

3. The proposed use will emit "criteria" pollutants and "toxic" pollutants (Source: Materials submitted by applicant, All Crematory, Anne Jackson et al.).

4. Emissions of these toxic materials is not practically avoidable or controlla-

ble under current cremation processes (Source: Environmental information from Industrial Equipment and Engineering Co., 6/21/2001).

5. The emission of mercury, hydrogen chloride, and other pollutants from the proposed crematory adds to the risk of exposure to these public health dangers for the residents, businesses and users of public facilities in the vicinity of the proposed crematory.

6. Currently, the cremation rate in the United States is approximately 24. Within the next 10 years it is anticipated that the demand for cremation services will increase nearly 70. (Source: Letter of Erny Czirok dated June 29, 2001).

7. In Minnesota cremations have increased from 1,622 in 1969 to 10,950 in 1999, and Ramsey County statistics parallel the increased use of cremation (Source: MN Department of Health, City Community Development Staff Research, 6/14/01).

8. For 2000, the statewide cremation percentage was 30.30 or about 32 per day (Source: fax from Timothy J. Koch dated 7/23/01).

9. Updated Federal and state standards regarding crematory emissions, location, and operating procedures have not yet been promulgated to adequately address the growing use of cremation, nor developments in medical science such as brachytherapy that that could introduce an additional environmental health threat, in spite of the 1990 Federal Clean Air Act amendments that require the Environmental Protection Agency to develop new source performance standards and emission guidelines for crematories.

10. The required emission limits for acid gases (sulfur dioxide and hydrogen chloride), particulate matter, opacity, metals (including cadmium, lead and mercury), organics (dioxins and furans), carbon monoxide and nitrogen oxides from crematories have not been established in part due to limited information available to environmental protection agencies (Source IEE Co./All Crematory).

Roselawn filed a declaratory judgment action in district court seeking judgment requiring the city to issue it a conditional use permit and damages. The city moved for summary judgment on the grounds that it acted reasonably in denying Roselawn's request and the city was immune from the damage claim. Shortly thereafter, Roselawn moved for summary judgment on its behalf. The district court granted summary judgment to the city.

## ISSUE

Was the city's decision to deny Roselawn a conditional use permit arbitrary, capricious, or unreasonable?

## ANALYSIS

■ On appeal from a district court's decision affirming the municipality's denial of a conditional use permit, this court independently reviews the record and the municipality's decision "without affording any special deference" to the district court's review. *Scott County Lumber Co. v. City of Shakopee*, 417 N.W.2d 721, 726 (Minn. App.1988), *review denied* (Minn. Mar. 23, 1988).

■ This court's review of city council's decision to deny a conditional use permit is limited to determining whether the denial of the conditional use permit was unreasonable, arbitrary, or capricious. *Honn v. City of Coon Rapids*, 313 N.W.2d 409, 416–17 (Minn.1981); *Molnar v. County of Carver Bd. of Cmm'rs*, 568 N.W.2d 177, 181 (Minn.App.1997). Pure questions of law, however, are reviewed de novo.

*Nordmarken v. City of Richfield,* 641 N.W.2d 343, 346 (Minn.App.2002), *review denied* (Minn. June 18, 2002).

▮▮▮▮ A city's denial that is based on a legally sufficient reason and supported by a factual basis is not unreasonable, arbitrary, or capricious. *C.R. Invs., Inc. v. Village of Shoreview,* 304 N.W.2d 320, 325 (Minn.1981). On appeal we affirm a municipality's decision so long as any one stated reason shows its decision was not arbitrary or capricious. *Trisko v. City of Waite Park,* 566 N.W.2d 349, 352 (Minn. App.1997), *review denied* (Minn. Sept. 25, 1997). Appellate courts defer to a municipality's decision when the factual basis for the denial has even the "slightest validity." *White Bear Docking & Storage, Inc. v. City of White Bear Lake,* 324 N.W.2d 174, 176 (Minn.1982). The permit applicant has the burden to persuade the appellate court that the municipality's reasons for denial of the conditional use permit are impermissible. *Hubbard Broad., Inc. v. City of Afton,* 323 N.W.2d 757, 763 (Minn.1982).

▮▮▮▮ In 1965 the legislature enacted the Municipal Planning Act (MPA), currently codified at Minn.Stat. §§ 462.351–.365 (2002), which provided "municipalities the authority to engage in comprehensive municipal planning activities." *Nordmarken,* 641 N.W.2d at 347. Under the MPA:

The governing body may by ordinance designate certain types of developments, including planned unit developments, and certain land development activities as conditional uses under zoning regulations. Conditional uses may be approved by the governing body or other designated authority by a showing *by the applicant* that the standards and criteria stated in the ordinance will be satisfied.

Minn.Stat. § 462.3595, subd. 1 (emphasis added). This language unambiguously places the burden on the applicant to prove the proposed use will conform to a city's stated standards and criteria for the issuance of a conditional use permit. *See Mut. Serv. Cas. Ins. Co. v. League of Minn. Cities Ins. Trust,* 659 N.W.2d 755, 760 (Minn.2003) (stating "where the intention of the legislature is clearly manifested by plain and unambiguous language, [appellate courts] have neither the need nor the permission to engage in statutory interpretation").

Under the city's zoning ordinances, the city council shall consider the following criteria when reviewing an application for a conditional use permit:

1. Impact on traffic.

2. Impact on parks, streets and other public facilities.

3. Compatibility of the site plan, internal traffic circulation, landscaping and structures with contiguous properties.

4. Impact of the use on the market value of contiguous properties.

5. Impact on the general public health, safety and welfare.

6. Compatibility with the city's comprehensive plan.

Roseville, Minn., City Code § 1013.01(D) (2001). Here, the city council determined:

As submitted by the applicant, the proposed use would negatively affect the character of the neighborhood due to the nature of the proposed use, the intensity of the proposed use, the proximity of residential properties, natural resources, and public facilities abutting or in close proximity to the subject parcel and the inability to fashion practical terms and conditions for the proposed use to protect the general health, safety and public welfare of the neighborhood and community.

■ It is well settled that protection of general public health, safety and welfare is a valid basis to deny a conditional use permit. *See SuperAmerica Group, Inc. v. City of Little Canada,* 539 N.W.2d 264, 267 (Minn.App.1995) (stating "city council may deny a conditional use permit only for reasons relating to the public health, safety, and general welfare or for incompatibility with a city's land use plan"), *review denied* (Minn. Jan. 5, 1996). Roselawn argues that the city acted arbitrarily because it did not make findings on the other factors provided by the city ordinance. Once the city determined that it must deny the conditional use permit to protect general public health, safety, and welfare, making findings on the other factors was unnecessary. Further, since we affirm a city's decision to deny a conditional use permit if any one stated reason is sufficient, we would not reach the city's finding on any of the other factors before we would affirm the city's decision. *See Trisko,* 566 N.W.2d at 352.

It is uncontested that the crematorium will emit certain "criteria" and "toxic" pollutants, including carbon monoxide, mercury and other metals, hydrogen chloride, dioxins, and furans. It is also uncontested that the cremation of individuals who had received a new cancer treatment would emit radioactive particles. It was Roselawn's duty to show that it could operate a crematorium in such a manner that emissions of these pollutants in a residential neighborhood near a reservoir supplying drinking water would not negatively impact the general public health, safety, and welfare. *See* Minn.Stat. § 462.3595, subd. 1.

■ Roselawn argues it was entitled to a conditional use permit because Jackson's opinion was the "only expert assessment" in the record, and she did not believe the operation of the crematorium would affect public health. A city council is free to disregard an expert's opinion when it is presented with conflicting non-experts' opinions, including those of area residents, so long as the reasons are concrete and based on observations, not merely on fear or speculation. *Billy Graham Evangelistic Ass'n v. City of Minneapolis,* 653 N.W.2d 638, 644–45 (Minn.App.2002), *rev'd on other grounds,* 667 N.W.2d 117 (Minn. 2003); *BBY Investors v. City of Maplewood,* 467 N.W.2d 631, 635 (Minn.App. 1991) (concluding "testimony" from neighborhood residents opposing the issuance of conditional use permit "effectively rebutted" applicant's expert evidence), *review denied* (Minn. May 23, 1991).

Here, area residents stated that they had conducted research on the pollutants likely to be emitted and provided exhibits supporting their statements. One resident presented data from the EPA that the preferred level for dioxins in drinking water is zero parts per million. Another resident stated that under his calculations the crematorium would be responsible for 1/42 of the statewide emission of mercury each year. Another resident stated that the crematorium would emit 22 pounds of hydrogen chloride per year and 1/3 of a pound of mercury per year, both of which the Congress of Industrial Hygienists consider to be "immediately dangerous to health and life." A fourth resident contradicted the suggestion that the emission of radioactive particles is prevented because the "controller" of the deceased's body is questioned to ensure that crematoriums do not cremate a person who has received brachytherapy.

Furthermore, Jackson's statements to the city council and the memoranda she submitted following the public hearing deal almost exclusively with the likely impact of the mercury emission. As the district court found, "While [Jackson's] back-

ground in the area of pollution control is significant, she did not claim any expertise in the health science, and ... [she] deferred to the Minnesota Department of Health as to matters relating to the impact of pollutants on health." But it is also uncontested that the crematorium will emit furans, dioxins, hydrogen chloride, radioactive particles, and other pollutants. The residents provided information based on scientific reports regarding the emission of these pollutants.

■ Roselawn has not pointed to any unrebutted information that was before the city council showing that emission of these other pollutants will not negatively affect the general public health, safety, or welfare. Jackson herself stated that the Minnesota Pollution Control Agency has "no responsibility for regulating radioactive material." The city council is not required to ignore neighborhood concerns in making its decision, nor does it bear the responsibility of showing that the concerns are unfounded. *See Swanson v. City of Bloomington*, 421 N.W.2d 307, 313 (Minn. 1988) (stating neighborhood feelings may be taken into account); *see also* Minn.Stat. § 462.3595, subd. 1 (placing burden on applicant).

Roselawn's failure to meet its burden under Minn.Stat. § 462.3595, subd. 1, is best summed up by the concerns of Councilmember Maschka who stated:

I'm still troubled with the issues that everything that we've seen, even when Miss Jackson was up here, she wasn't definitive, nobody seems to be able to be definitive on this stuff. They seem to say, we think, and that's fine, I mean, it appears highly unlikely, but if you've got mercury poisoning, you don't really care whether it was highly unlikely.... We don't have certainty. The only certainty we have here, we have certain unknowns and it appears to me based on every-

thing that we've seen that the certainty is not a pleasant thing.

■ A municipality's denial of a conditional use permit requires both a factual determination about the proposed use and an exercise in discretion in determining whether to permit the use. *Shetka v. Aitkin County*, 541 N.W.2d 349, 352 (Minn. App.1995), *review denied* (Minn. Feb. 27, 1996). It is not the function of this court to replace the city council's judgment with our own. Rather, this court defers to a municipality's decision when the factual basis for the denial has even the "slightest validity." *White Bear Docking & Storage*, 324 N.W.2d at 176.

■ The fact that the crematorium would emit toxic compounds, including radioactive particles if a person who had received brachytherapy was cremated, in a residential neighborhood 2,500 feet away from a reservoir supplying drinking water without Roselawn showing that emission of these toxic compounds will not affect the general health, welfare, and public safety provides a factual basis for the city to deny the conditional use permit. Because the city denied Roselawn's application for a conditional use permit for a legally sufficient reason that has a factual basis in the record, we conclude the city's decision was not unreasonable, arbitrary, or capricious. *See C.R. Invs.*, 304 N.W.2d at 325.

We also disagree with Roselawn's argument that the city acted unreasonably because it did not order an environmental assessment worksheet before denying the conditional use permit. The burden is on the applicant for a conditional use permit to show that the proposed use will meet the standards provided for in the zoning ordinance. Minn.Stat. § 462.3595, subd. 1. If Roselawn believed that such a worksheet would show that the operation of a crematorium would not present a danger

to the community, the burden was on Roselawn to provide such information or at least to request that it be allowed to complete the assessment before the city council made its final decision.

## DECISION

The city did not act unreasonably, arbitrarily, or capriciously when it denied Roselawn's request for a conditional use permit.

**Affirmed.**