*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0865**

Volunteers of America-Minnesota,
Appellant,

vs.

City of Saint Paul,
Respondent.

**Filed January 20, 2015
Affirmed
Bjorkman, Judge**

Ramsey County District Court
File No. 62-CV-13-7487

Thomas L. Johnson, Gregory R. Merz, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, Minnesota (for appellant)

Sara R. Grewing, St. Paul City Attorney, Lawrence J. Hayes, Jr., Assistant City Attorney, St. Paul, Minnesota (for respondent)

Considered and decided by Connolly, Presiding Judge; Halbrooks, Judge; and Bjorkman, Judge.

**U N P U B L I S H E D   O P I N I O N**

**BJORKMAN**, Judge

Appellant Volunteers of America-Minnesota (VOA) challenges respondent City of St. Paul's denial of its application for a conditional-use permit (CUP), arguing that the

city's denial of the CUP and requested special-condition modification is arbitrary and capricious. We affirm.

**FACTS**

VOA is a faith-based, nonprofit organization that operates a residential re-entry center in Roseville for adults transitioning out of the federal corrections system. The Roseville center is licensed by the Minnesota Department of Corrections and operates under a contract with the federal government. The contract requires VOA to provide a variety of supportive services, and VOA employs 20 full-time staff to meet this requirement. VOA also receives a per diem payment from the federal government for each resident housed at the Roseville center. Under this arrangement, the Roseville center only generates sufficient revenue to operate when it houses 74 residents.

VOA must relocate the Roseville center due to the expiration of its lease. VOA identified 1394 Jackson Street in St. Paul as a suitable site and signed a purchase agreement in 2011. The Jackson Street property has served as a community-residential facility in the past, at times housing over 100 residents. It is located in the Jackson-Arlington area, which is generally bounded by Arlington Avenue on the north, Jackson Street on the west, Maryland Avenue on the south, and Interstate 35E on the east. VOA proposes to operate the Jackson Street center with 74 residents so it can continue to provide the staffing and services necessary under its federal contract.

The Jackson Street property is zoned I-1, "light industrial," so VOA must secure a CUP to operate a residential facility there. St. Paul, Minn., Legislative Code (SPLC) § 66.521 (2013). To obtain a CUP, VOA must satisfy the zoning code's five general

2

conditions and six special conditions related to correctional-community residential facilities. The five general conditions require VOA to show:

> (a) The extent, location and intensity of the use will be in substantial compliance with the Saint Paul Comprehensive Plan and any applicable subarea plans which were approved by the city council.
> (b) The use will provide adequate ingress and egress to minimize traffic congestion in the public streets.
> (c) The use will not be detrimental to the existing character of the development in the immediate neighborhood or endanger the public health, safety and general welfare.
> (d) The use will not impede the normal and orderly development and improvement of the surrounding property for uses permitted in the district.
> (e) The use shall, in all other respects, conform to the applicable regulations of the district in which it is located.

SPLC § 61.501 (1981). The Saint Paul Comprehensive Plan (comprehensive plan) adopted February 24, 2010, is the relevant plan for purposes of section 61.501(a). The "applicable subarea plan" is the North End-South Como District 6 Plan (district plan).[1]

The only special condition at issue is section 65.154(d) of the zoning code, which limits the number of residents housed at a community residential facility licensed by a correctional agency to 16 residents. SPLC § 65.154(d) (2005). VOA requested an upward modification of this limit to allow 74 residents at the Jackson Street center.

VOA's CUP application was initially reviewed by the staff of the St. Paul Planning Commission's zoning committee. The zoning committee reviewed and adopted the staff report's findings and recommended approval of the CUP and special-condition

---

[1] The district plan also refers to the 1991 Jackson-Arlington Small Area Plan, which has been decertified.

modification to the planning commission. The planning commission approved the CUP and granted an upward modification allowing up to 32 residents.

VOA appealed the denial of its request for a 74-resident modification. The District 6 Planning Council appealed the issuance of the CUP. The St. Paul City Council granted the district's appeal and denied VOA's CUP application on the ground that the general conditions in section 61.501 are not satisfied.[2]

VOA filed for judicial review of the denial in district court. Both VOA and the city moved for summary judgment. The district court granted the city's motion, concluding that the denial of the CUP is not arbitrary or capricious. VOA appeals.

## D E C I S I O N

On appeal from a district court's decision affirming a city's denial of a CUP, this court independently reviews the record and the city council's decision without affording any special deference to the district court's review. *Scott County Lumber Co. v. City of Shakopee*, 417 N.W.2d 721, 726 (Minn. App. 1988), *review denied* (Minn. Mar. 23, 1988). Our review is limited to determining whether denial of the permit was unreasonable, arbitrary, or capricious. *Roselawn Cemetery v. City of Roseville*, 689 N.W.2d 254, 258 (Minn. App. 2004). If a city's denial is based on a legally sufficient reason and supported by the facts, it is not unreasonable, arbitrary, or capricious. *C.R. Invs., Inc. v. Vill. of Shoreview*, 304 N.W.2d 320, 325 (Minn. 1981). The permit applicant has the burden to persuade this court that the city's reasons for denying a CUP

---

[2] The city did not address the requested special-condition modification because it denied the CUP.

4

lack factual support in the record or are legally insufficient. *Hubbard Broad., Inc. v. City of Afton*, 323 N.W.2d 757, 763 (Minn. 1982).

The city determined that the planning commission erred in finding that the proposed Jackson Street center satisfies all five general conditions of the zoning code. First, the city concluded that the Jackson Street center is not in "substantial compliance" with the comprehensive and district plans, which identify industrial redevelopment as a key priority for the area. *See* SPLC § 61.501(a). Second, the city determined that the Jackson Street center would impede the development of the surrounding industrial properties. *See* SPLC § 61.501(d). VOA argues that these findings are arbitrary and capricious because the city ignored evidence that the Jackson Street center is compatible with the relevant plans and would not hinder the area's industrial redevelopment. We address each finding in turn.

I.      **The city's finding that the Jackson Street center does not substantially comply with the comprehensive and district plans is not arbitrary and capricious.**

Both the comprehensive and district plans prioritize light industrial redevelopment in the Jackson-Arlington area. The Land Use section of the comprehensive plan outlines a policy to preserve existing industrial land and redevelop sites to support current and new industrial uses. While the comprehensive plan creates a general framework to facilitate industrial development in St. Paul, the district plan specifically addresses industrial redevelopment in the Jackson-Arlington area. The district plan states that the western portion of the area, where the Jackson Street center would be located, should be redeveloped as "a business center with light industrial and office-service uses." The

5

district plan also notes the St. Paul Port Authority's active involvement in redeveloping the Jackson-Arlington area as an industrial and commercial center.

VOA does not dispute these aspects of the comprehensive and district plans. Rather, VOA contends that the city's denial of the CUP is arbitrary because the Jackson Street center is consistent with the comprehensive plan's designation of the Jackson-Arlington area as an "opportunity site." The comprehensive plan states that development in opportunity sites should focus on either mixed-use development or creation of employment centers. VOA asserts that the Jackson Street center is consistent with both of these goals. We disagree.

First, we are not persuaded that the Jackson Street center constitutes a mixed-use development. The comprehensive plan defines a mixed-use development as an area "where two or more of the following uses could be located: residential, commercial, retail, office, small scale industry, and open space uses." VOA argues that the Jackson Street center meets this definition by virtue of the fact that its staff members have offices. But the space assigned to staff is part and parcel of the services VOA offers to its residents. The proposed office space does not represent a separate and distinct use of the facility to qualify as mixed-use.

Second, we are not convinced that the Jackson Street center constitutes an employment center. VOA contends that the center's staffing requirements will bring 20 new jobs to the area. While the comprehensive plan does not define employment center, we agree that the staff positions would be new to the Jackson-Arlington area. But we

agree with the city that the positions will likely be filled by existing staff from the Roseville center.

In the alternative, VOA contends that because residential uses are not per se disallowed in I-1 zones, the city cannot, as a matter of law, deny a CUP application on the ground that the Jackson Street center is residential. We disagree. The Jackson Street center is not permitted as of right; it is a conditional use. By definition, the city has discretion to assess the nature of a proposed conditional use and grant or deny a permit based on the circumstances. Under the zoning code, a key aspect of exercising this discretion includes examining whether the proposed use complies with the comprehensive and district plans. As noted, both plans prioritize industrial redevelopment in the Jackson-Arlington area. The residential Jackson Street center is inconsistent with that directive.

Where, as here, evidence supporting each party's contention can be found in the record, a city's decision is not arbitrary and capricious simply because reasonable minds may differ on the appropriate conclusion. *See White Bear Docking & Storage, Inc. v. City of White Bear Lake*, 324 N.W.2d 174, 176 (Minn. 1982) (stating that the "mere fact" a court might have reached a different conclusion does not invalidate the city's decision if it "acted in good faith and within the broad discretion accorded [it]"). And the record contains ample evidence to support the city's conclusion that the Jackson Street center would not substantially comply with the comprehensive and district plans.

The city indicated that the area is poised to carry out the type of industrial redevelopment envisioned in the comprehensive and district plans due to several major

road construction projects that are nearing completion. The St. Paul Port Authority intends to assist with this redevelopment and expressed concern that the Jackson Street center might hinder its efforts. Furthermore, the city correctly noted that the desire to redevelop the area as an industrial corridor goes back approximately 30 years. These factors support the finding that the Jackson Street center does not align with the relevant plans, and we defer to the city when its factual basis for denying a CUP has even "the slightest validity." *Roselawn Cemetery*, 689 N.W.2d at 261 (quotation omitted). On this record, we conclude that the city's determination that the Jackson Street center was not in substantial compliance with the relevant plans is not arbitrary and capricious.

**II.     The city's finding that the Jackson Street center would impede normal and orderly development is not arbitrary and capricious.**

The city found that relocating a residential use to the Jackson Street property "will impede any new industrial or office park development that is likely to come to the area based upon the pending improvements to 35E and Maryland Avenue." In making this determination, the city repeated its concern that the Jackson Street center would be at odds with the type of industrial development that has long been an area priority. VOA argues the city improperly based its finding on the sole fact that the Jackson Street center would be a residential use, and ignored evidence that similar VOA facilities have not impeded industrial development. Additionally, VOA asserts that the city overlooked the Jackson Street property's history of residential use.

As noted above, the record reflects that the Jackson-Arlington area is currently well-positioned to experience the type of industrial development envisioned in both the

8

comprehensive and district plans. The city observed that this development has been a long time coming, over 30 years. Moreover, the St. Paul Port Authority echoed the city's concerns about placing a residential use in a light industrial zone, stating in the record that the loss of industrial land to a residential use could hinder its redevelopment plans. With these concerns in mind, the city's reluctance to permit a non-conforming use in the Jackson-Arlington area at this critical juncture is reasonable.

In contrast, VOA's contention that the Jackson Street center will not impede light industrial development is mostly speculative. VOA points to the "extensive redevelopment" of the area around its community residential facility near Lake Street in Minneapolis as evidence that its proposed residential use will not negatively impact development in the Jackson-Arlington area. Specifically, VOA notes that redevelopment surrounding its Lake Street center includes "a U.S. Bank branch building, a Target store, a Rainbow store, a Cub store, a public library, senior and multi-family housing, a U.S. Post Office, a Minneapolis Police precinct station, and a multitude of other new industrial and commercial residential developments." We are not persuaded that the success of the primarily non-industrial development near VOA's Lake Street facility is predictive of the proposed Jackson Street center's impact on light industrial development. Such extrapolation based on the experience of a different facility also does not account for the varied local dynamics that may impact economic development.

VOA also points out that its current facilities in Roseville and along Lake Street "show a successful track record and positive feedback from neighbors." This positive track record might alleviate concerns about the Jackson Street center's correctional

9

nature, but it does not establish that the center would not impede future plans for industrial and commercial development.

Finally, VOA argues that the city's decision is arbitrary and capricious because the Jackson Street property has a history of residential use. We disagree. First, even if the property previously housed a residential facility, the city's decision is consistent with the district plan's current policy favoring the elimination of non-conforming residential uses in industrial-zoned areas. Second, the city, as far back as 1991, has recognized that the residential use of the Jackson Street property is "inconsistent with the general character of development in the surrounding area." As such, it is reasonable for the city to decline to permit a conditional residential use going forward in order to facilitate well-established plans to uniformly develop the area as an industrial corridor.

We are mindful of the important services VOA provides to its residents and the community. The record contains strong expressions of support for the Jackson Street center, including statements addressing the positive impact existing VOA facilities have had on their current neighborhoods. Opposition is also found in the record, focusing on the loss of industrial land and jobs, an over-concentration of residential and public housing facilities, and the negative impact on the area tax base. In short, there is evidence to support both the grant and the denial of a CUP. And after reviewing the competing evidence, the city made a well-supported determination that the Jackson Street center failed to meet section 61.501(d) of the zoning code because it is inconsistent with the city's established vision of the area as a growing light industrial center.

10

On this record, we conclude that the city's determination that the Jackson Street center would impede the normal and orderly development of the area is not arbitrary and capricious. Having determined that neither of the city's bases for denying the CUP is improper, we need not address VOA's request for a special-condition modification.

**Affirmed.**