*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1179**

Cory Axelson,
Relator,

vs.

Goodhue County Board of Commissioners,
Respondent.

**Filed April 6, 2015
Affirmed
Halbrooks, Judge**

Goodhue County Board of Commissioners

Cory Axelson, Welch, Minnesota (pro se relator)

Joseph J. Langel, Ashley R. Geisendorfer, Ratwik, Roszak & Maloney, P.A., Minneapolis, Minnesota (for respondent)

Considered and decided by Halbrooks, Presiding Judge; Johnson, Judge; and Larkin, Judge.

## U N P U B L I S H E D   O P I N I O N

**HALBROOKS**, Judge

Respondent Goodhue County Board of Commissioners revoked the conditional-use permit (CUP) governing the Hidden Valley Campground after it determined that pro se relator Cory Axelson expanded the size and location of the campground in violation of the CUP's condition that the campground not encompass any further area.

Because the record demonstrates that the board's decision was not arbitrary, unreasonable, or capricious, we affirm.

## FACTS

Axelson owns the Hidden Valley Campground located in Goodhue County. From 1982 until 2012, the campground operated under a CUP that permitted a campground containing 20 mobile home park sites and 200 camp sites, provided that the campground "not encompass any further area."

In 2006, staff members of the county's Land Use Department (LUD) became concerned that Axelson expanded the scope of the campground after flooding of the Cannon River destroyed several existing campsites. They informed Axelson that before he could expand the campground's boundaries, he needed to apply for an amendment to the CUP. He subsequently petitioned the county to modify the CUP to allow for additional campsites, but the board denied his application. Two years later, Axelson applied to amend the CUP to permit 100 additional sites and to install a septic system; the board denied his request.

Shortly after the second denial, the LUD sent Axelson a letter expressing concerns that the campground contained more than 200 camp sites. The county conducted a zoning inspection of the campground and noted what it believed to be several violations of the state's wastewater treatment rules. After conducting a hearing to discuss the campground's wastewater drainage problem, the board voted to revoke the CUP.

Axelson appealed, and we reversed. *Axelson v. Goodhue Cnty. Bd. of Comm'rs,* No. A12-0041, 2012 WL 3263901, at *4 (Minn. App. Aug. 13, 2012). We determined

2

that the board lacked any evidence demonstrating that the campground violated a condition of the CUP because the record only reflected the board's concern for improper wastewater treatment, a condition the CUP did not address. *Id.* at *3-4.

Eighteen months later, the state obtained a permanent injunction prohibiting Axelson from operating a recreational campground on the property occupied by Hidden Valley. The district court ordered the injunction based on evidence that Axelson operated the campground without a license and violated several provisions of the state's health code.

Shortly after the state obtained the injunction, the county again provided Axelson with notice of its intent to revoke the CUP. The informational packet delivered to Axelson alleged five violations of the CUP: (1) "Unauthorized Expansion of the Campground," (2) "Relocation of Campsites and Campground Roads," (3) "Exceeding two hundred (200) campsites," (4) "Operating a campground without a License," and (5) "Lack of a valid State Disposal System (SDS) permit." The packet also contained several of the photographic exhibits cataloging the newly created campsites.

A few weeks later, the board conducted the first of two hearings regarding the fate of the CUP. The board received 45 exhibits contained in the LUD report, as well as numerous maps and documented communication between Axelson and county staff. Lisa Hanni, the LUD director, provided substantial testimony about the report. She referenced several photographs documenting new campsites created in the aftermath of flooding. These photos contained GPS coordinates and were placed side by side with pre-2006 photos showing no campsites on the same land. Hanni also referenced several aerial

3

photographs of the campground with the legal description of the campground superimposed over the original topographical images. The department took the GPS-stamped photographs and placed markers on the aerial photographs, pinpointing the location of the new sites. Hanni testified that these photos informed her belief that the campground now encompassed a "further area" in violation of the CUP.

Axelson cross-examined Hanni, provided his own testimony, and introduced several of his own exhibits. He relied on this court's prior opinion to argue that the board could revoke the CUP only if he violated a specific condition contained in the CUP. He also claimed that the legal description provided for in the CUP only covered a portion of the campground's pre-CUP borders, and therefore any evidence of activities occurring on portions of the campground beyond the legal description in the CUP could not be the basis for the board's decision to revoke the CUP.

Axelson failed to persuade the board, which adopted the factual findings presented by Hanni. But the board decided to table a vote on CUP revocation in order to consider alternatives to revocation. At a second hearing, seven weeks later, the board heard from Hanni that Axelson failed to establish any acceptable alternatives, and the board voted to revoke the CUP on the five bases alleged by the LUD. Axelson now appeals.

## D E C I S I O N

### I.

Axelson argues that the board revoked his CUP without demonstrating that he violated a condition of the CUP. A CUP is a protected property right. *Northpointe Plaza v. City of Rochester*, 465 N.W.2d 686, 689 (Minn. 1991). A CUP "shall remain in effect

4

for so long as the conditions agreed upon are observed." Minn. Stat. § 394.301, subd. 3 (2014); *Upper Minnetonka Yacht Club v. City of Shorewood*, 770 N.W.2d 184, 187 (Minn. App. 2009).

Counties have "wide latitude" over land-use decisions, and appellate courts afford these decisions great deference. *Schwardt v. Cnty. of Watonwan*, 656 N.W.2d 383, 386 (Minn. 2003). On review of quasi-judicial land-use decisions, we will affirm the municipality's action, provided that it was not "arbitrary, capricious, or unreasonable." *Bartheld v. Cnty. of Koochiching*, 716 N.W.2d 406, 411 (Minn. App. 2006). A municipality need only provide a single stated reason to demonstrate the reasonableness of its decision. *Roselawn Cemetery v. City of Roseville*, 689 N.W.2d 254, 259 (Minn. App. 2004).

The board considered a "Resolution of Revocation," citing five reasons to revoke the CUP: (1) "Unauthorized Expansion of the Campground," (2) "Relocation of the Campsites and Campground Roads," (3) "Exceeding two hundred (200) campsites," (4) "Operating a campground without a License," and (5) "Lack of a valid State Disposal System (SDS) Permit." The board contends that the first two bases support its decision to revoke the CUP because they demonstrate that Axelson violated the condition that the campground "not encompass any further area." Axelson disagrees. He argues that the CUP does not contain a boundary condition—only a number-of-campsites condition.

We are convinced that the CUP contains a boundary condition. The legal description of the land subject to the CUP and the explicit phrase that the campground "not encompass any further area" act to constrain the area over which the campground

5

may be operated. Axelson's view would render this phrase superfluous and violates the requirement that a CUP be geographically constrained. *See Northpointe Plaza*, 465 N.W.2d at 689 (stating a CUP "runs with the affected land"). In addition, Axelson's interpretation negates the requirement to provide a description of the land covered by a CUP and is inconsistent with the idea that localities may constrain the existence of nonconforming land to its existing borders. *See Krummenacher v. City of Minnetonka*, 783 N.W.2d 721, 726 (Minn. 2010). The CUP contains a boundary condition.

Although never fully articulated, the parties' disagreement about the meaning of this phrase actually appears to turn on what land the campground may not further encompass. Axelson points out that the legal description of the land provided for in the 1982 CUP did not cover all of the campground's then-existing area. He asserts that it is the pre-CUP borders, not the legal description contained in the CUP, which confine the scope of the campground. He contends that the board's evidence showing "expansion" or "relocation" of campsites is not relevant because the new sites, while created after 1982, exist within the campground's pre-CUP borders and therefore do not encompass any further area. The board, on the other hand, asks us to re-write the legal description provided for in the CUP to include the portion of the campground that is not contained within the legal description of the CUP but which the county and Axelson believe to be covered by the CUP over the last 30 years.

Because this dispute is outside the scope of these proceedings, we need not resolve it. Hanni presented the board with photographs showing campsites located outside *both* the pre-CUP campground borders *and* the legal description provided for in the CUP.

6

Some of the photos contain GPS coordinates and are presented side by side with land previously unencumbered by campsites. Those photos show campsites existing outside the campground's 1982 borders. Other photos are aerial shots of the campground with the legal description provided in the CUP superimposed over the campground, with some campsites marked outside the legal borders provided for in the CUP as well.

These photos persuaded the board to adopt the LUD's factual findings that the expansion of the campground occurred in 2006 and 2008. The board determined that each time Axelson applied to expand the geographic reach of the CUP, he had in fact already built new campsites on the land he sought permission to develop. Axelson never directly rebutted this evidence. The board did not act unreasonably in determining that the campground now encompasses a greater area, whether that area is the pre-CUP borders or the legal description provided for in the CUP. Because we can affirm the board's decision on the basis of a single reasonable stated rationale, we do not address the board's remaining justifications for terminating the CUP. *See Roselawn Cemetery*, 689 N.W.2d at 259.

## II.

Axelson next argues that the board violated his due-process rights when it failed to provide him with adequate notice of the nature of the hearing or deliver to him all of the evidence that might possibly be used at the hearing.

Whether the right to due process has been violated is a question of law reviewed de novo. *Comm'r of Natural Res. v. Nicollet Cnty. Pub. Water/Wetlands Hearings Unit*, 633 N.W.2d 25, 29 (Minn. App. 2001), *review denied* (Minn. Nov. 13, 2001). Due

process requires that a deprivation of property be preceded by adequate notice and a meaningful opportunity to be heard. *Id.* "Adequate notice" and "meaningful opportunity to be heard" are flexible concepts that depend on the circumstances of the case, *Staeheli v. City of St. Paul*, 732 N.W.2d 298, 304 (Minn. App. 2007), with quasi-judicial proceedings not requiring the "full panoply of procedures" used in "regular judicial proceedings." *Barton Contracting Co. v. City of Afton*, 268 N.W.2d 712, 716 (Minn. 1978).

Eighteen days before the revocation hearing, the county provided Axelson with a letter stating that a public hearing was scheduled to decide whether to revoke the CUP. The letter outlined five alleged violations of the CUP that could support revocation. The board ultimately voted to revoke the CUP based on the same five reasons. Axelson argues that the county did not provide him with all of the evidence in the county's possession, but he acknowledges that he did receive several salient exhibits and a list of all of the potential evidence. Axelson could have no doubt about the nature of the hearing, and he does not point to any authority stating that municipalities considering quasi-judicial decisions must turn over *all potential* evidence to an affected party prior to conducting a hearing. We therefore conclude that the board provided him with adequate notice of the nature of this quasi-judicial proceeding. *See Barton*, 268 N.W.2d at 716.

The board also provided Axelson with the opportunity to be heard. Axelson testified, cross-examined witnesses, and introduced evidence at the hearings. He used these opportunities to persuade the board to table its vote on revoking the CUP, and he convinced one commissioner to vote in his favor on two of the five bases for revocation.

8

Because the board provided Axelson with sufficiently robust protections to ensure that it considered his viewpoint before voting to terminate the CUP, *see Barton*, 268 N.W.2d at 716, the board did not violate Axelson's right to due process.

## III.

Axelson contends that the board obtained evidence in violation of his Fourth Amendment rights and that the board's decision to target him while ignoring other violators denied him equal protection under the law. Axelson failed to support these arguments with reference to evidence contained in the record or relevant legal authority. These inadequacies preclude us from considering the viability of his claims. *See State v. Modern Recycling, Inc.*, 558 N.W.2d 770, 772 (Minn. App. 1997) (deeming arguments unsupported by legal authority to be waived unless prejudicial error is "obvious" upon "mere inspection"); *see also* Minn. R. Civ. App. P. 128.03 (requiring citations to facts within the record).

**Affirmed.**